# MAY, 1947

GUADALUPE-BLANCO RIVER AUTHORITY ET AL V. CITY OF SAN ANTONIO ET AL.

No. A-811. Decided February 26, 1947.
Rehearing overruled April 2, 1947.
Second Motion for rehearing overruled May 7, 1947.
(200 S. W., 2d Series, 989.)

612

D. W. *Glasscock*, A. J. *Wirtz*, and *Hart & Brown*, all of Austin, *E. M. Cape* and *Tom G. Oliver, Jr.*, both of San Marcos, *Fred L. Blundell*, of Lockhart, *Vinson, Elkins, Weems & Francis*, *W. A. Vinson, Chas. I. Francis* and *Tarlton Morrow*, all of Houston, for Guadalupe-Blanco River Authority, *Ben H. Powell, J. A. Rauhut* and *W. S. Gideon*, all of Austin, for Lower Colorado River Authority, petitioners.

The Court of Civil Appeals erred in holding that the contract made by the City of San Antonio and the Guadalupe-Blanco River Authority and the correlative contracts were each and all null and absolutely void. Ashwander v. Tennessee Valley Authority, 297 U. S. 288; Lombardo v. City of Dallas, 124 Texas 1, 73 S. W. (2d) 475; Texas Natl. Guard Armory Bd. v. McCraw, 132 Texas 613, 126 S. W. (2d) 627.

T. D. *Cobb, Jr.*, Ctiy Attorney, *Martin Arnold*, both of San

Antonio, *Weaver Moore,* of Houston, and *Dan Moody,* of Austin, for the City of San Antonio, *Brewer, Matthews, Nowlin & McFarlane,* of San Antonio, for Board of Trustees of San Antonio Electric & Gas System, and *Chapman & Cutler* and *Dayton* all of Chicago, Ill., *Truehart, McMillian & Russell,* and *C. W. Truehart,* all of San Antonio, for Harris, Trust & Saving Bank and Harold Eckhart, Trustees, respondents.

The lease contract is void because the city was prohibited by terms of Article 1111-1118 from entering into it. The City was not estopped to challenge the validity of the lease contract. City of Dayton v. Allred, 123 Texas 60, 68 S. W. (2d) 172; City of Houston v. Mann, 139 Texas 640, 164 S. W. (2d) 251; Radford v. City of Cross Plains, 126 Texas 153, 86 S. W. (2d) 204; Doty v. Barnard, 92 Texas 104, 47 S. W. 712.

MR. CHIEF JUSTICE ALEXANDER delivered the opinion of the Court.

The City of San Antonio (City) brought this suit against Guadalupe-Blanco River Authority (GBRA) and others to cancel a contract by which the City leased to GBRA, with an option to buy, the electric generating plant located at New Braunfels, known as the Comal plant, and various tracts of real estate, electric transmission lines, transformers, easements, and other properties used in connection therewith. The trial court instructed a verdict for the defendant and entered judgment accordingly. This judgment was reversed by the Court of Civil Appeals, and judgment rendered for the plaintiff. 191 S. W. (2d) 118.

The City's major contention is that the lease contract under consideration is void because it was an attempt by the Board of Commissioners of the City to encumber the City's electric power system without a vote of the qualified voters in violation of the provisions of Revised Statutes, Article 1112. On the other hand, GBRA contends that the City had previously agreed to the lease contract as a condition to its right to acquire the property and that it acquired the property burdened with the lease, and as a consequence the contract is valid. We will discuss this major point first.

The record is very voluminous. We will state the facts as briefly as possible.

The San Antonio Public Service Company (SAPSCo) was a

public service corporation engaged principally in generating, transmitting, and distributing electric energy for public consumption. It owned and operated a large steam-operated electric generating plant in New Braunfels, two hydro plants in the same vicinity, a large generating plant known as Station "B" in the City of San Antonio, various tracts of land used in connection therewith, 274 pole miles of high-power transmission lines, over 2200 miles of primary wire lines, and sundry transformers and meters for serving over 86,000 customers. It operated in Bexar, Kendall, Wilson, Medina, Guadalupe, Comal, Caldwell, Karnes, Atascosa, Uvalde, and Bandera Counties and supplied San Antonio, Boerne, Floresville, Hondo, Poth, New Braunfels, Stockdale and the inhabitants thereof, and various urban and rural districts with electric energy for lights and power. Its stock was held by the American Light & Traction Company, a holding company. In 1941 the Securities and Exchange Commission ordered the American Light & Traction Company to dispose of its interest in SAPSCo. This it could do by (a) dividing the stock of SAPSCo among its stockholders, (b) selling the assets of SAPSCo, or (c) selling the stock of SAPSCo. It elected to pursue this latter course.

GBRA is a water conservation and reclamation district created under a special act of the Legislature to impound, conserve, and use the waters of the Guadalupe and Blanco Rivers in the manufacture and sale of electric energy. Its domicile is in New Braunfels, Comal County. Acts 1933, 43rd Leg., 1st C. S., p. 198, ch. 75, as amended by Acts 1935, 44th Leg., 1st C. S., p. 1615, ch. 410. (Vernon's Civ. Stat. Art 8197f etseq.) Lower Colorado River Authority (LCRA) is a similar corporation created for the purpose of impounding and using the waters of the lower Colorado River. Acts 1934, 43rd Leg., 4th C. S., p. 19, ch. 7, as amended by Acts 1941, 47th Leg., p. 657, ch. 398.

Upon learning that the assets of SAPSCo were for sale, GBRA conceived the idea of acquiring same. At first it was contemplated that LCRA would join in the enterprise, but lack of authority to issue additional bonds forced it to abandon the project. GBRA's representative then approached the Mayor of the City and suggested that GBRA and the City cooperate in the acquisition of the properties of the SAPSCo, but was informed by the Mayor that the City did not care to join in the undertaking. Thereupon GBRA alone began to make plans for the acquisition of the properties of SAPSCo. By early May, 1942, GBRA had produced and projected a plan, and secured the ap-

proval thereof by the State Board of Water Engineers, for the issuance of revenue bonds of the Authority in the sum of forty million dollars, the building of dams for the storage of the flood waters of Guadalupe and Blanco Rivers, the building of a hydro-electric generating plant to be operated with the water so impounded, and for the purchase of the properties of SAPSCo for use in connection with the hydro-electric plant; had arranged for the sale of its bonds; and had reached a tentative agreement with the President of the American Light & Traction Company under which the stock of SAPSCo was to be conveyed to GBRA at a stipulated price (This agreement, however, was never approved by the stockholders of American Light & Traction Company.)

When the Mayor and Commissioners of the City learned of the steps being taken by GBRA to acquire the assets of SAPSCo they began to take steps to defeat the efforts of GBRA and to acquire the properties for the City. Then began a race between the City and GBRA in an effort to acquire the properties.

On May 27, 1942, the City Commissioners passed a resolution authorizing the Mayor to enter into negotiations for the purchase of the properties of SAPSCo, and on June 8, 1942, the City Commissioners passed another resolution in which it was recited that "the City of San Antonio has been advised * * * that said American Light & Traction Company has practically completed negotiations for the sale of said properties to Guadalupe-Blanco River Authority and that said Company expects to hold a meeting of its Board of Directors on the morning of June 10, 1942, for the purpose of consummating said sale; * * *." Said resolution instructed the Mayor to begin negotiations for the purchase of the properties of SAPSCo and directed the City Attorney "to institute all such litigation in either State or Federal courts as in his opinion may be desirable to prevent acquisition of said properties or stock by Guadalupe-Blanco River Authority." The City gave notice of intention to acquire "an electric light and power plant and system and gas distribution system serving the City of San Antonio and its inhabitants and territory adjacent to said City"; authorized the issuance of bonds in the sum of 35 million dollars for that purpose; and employed a group of investment bankers and engineers to assist the City in the sale of its bonds and in the purchase of the properties of SAPSCo. The City filed suit in Travis County to set aside the order of the Board of Water Engineers approving the plan of GBRA, and filed a condemnation suit in Bexar County to condemn the property of SAPSCo. GBRA retaliated

by filing a similar condemnation suit in the County Court of Comal County. It also filed a suit in the District Court of Hays County to condemn all the property of SAPSCo wherever located. Lis pendens notice of this suit was filed in Bexar and other counties. The City then filed a condemnation suit in the County Court of Comal County seeking to condemn the same property. In all, thirteen suits were filed. Finally, GBRA filed suit in the District Court of Comal County and secured an order enjoining the City from further proceeding with any of the suits previously filed by it, and SAPSCo filed suit in the District Court of Bexar County against GBRA to remove cloud from the title to its property and secured an order enjoining GBRA from proceeding with the prosecution of any of the suits previously filed by it. Thus a legal impasse or stalemate was reached. Neither party could proceed with the prosecution of any of the suits filed by it without violating an injunction. The City and SAPSCo finally applied to the Supreme Court for writ of mandamus to compel the District Judge of Comal County to modify the injunction previously issued by him. However, this suit was later dismissed.

In the meantime the City had induced American Light & Traction Company to break off its negotiations with GBRA and to enter into a contract with the City for the sale of the stock of SAPSCo. It had also contracted for the sale of its bonds. Large profits were to be made by any one who could acquire the assets of SAPSCo. All parties recognized this. But the City was pressed for time. Its contract for the sale of its bonds was to expire on October 26 and the contract for the purchase of the stock of SAPSCo was to expire December 1. The City could not buy the stock unless it could sell its bonds; it could not issue and sell its bonds without the approval of the Attorney General; the Attorney General would not approve the bonds without a certificate that no litigation was pending which would affect the validity of the bonds; and the "non litigation" certificate could not be given so long as the suits previously filed by GBRA were pending. The situation was propitious for a compromise. The investment bankers recognized this. Consequently, early in September, they asked for an secured the permission of the Mayor of the City to approach the representatives of GBRA for a settlement.

By October 23rd the parties had reached an agreement satisfactory to all concerned. It is not necessary to give the details of the agreement in full. In general, GBRA was to dismiss the suits filed by it and allow the City to acquire the properties of

SAPSCo subject to the lease contract in favor of GBRA. The lease contract subsequently signed by the City and GBRA in consummation of this tentative agreement recites that each of the parties had theretofore indicated its desire to acquire the properties of SAPSCo; that the City desired to confine its operations to what was designated as "the City's service area," which area was defined as including the City of San Antonio and all territory within a radius of eleven miles thereof, and that it would be undesirable for the City to operate the electric system outside of said area; and that the parties had determined that it would result in substantial savings in cost to the inhabitants of the City to have the Comal plant operated by GBRA in connection with the hydro-electric plant to be established by it. It further recited that it would be advantageous for the cities of Poth, Stockdale, Floresville, Boerne, Hondo, and New Braunfels to own and operate the distribution system within their limits, respectively, and that GBRA should operate the balance of the system, including the generating plant at New Braunfels known as the Comal plant and the distribution system used in connection therewith located outside of the City service area and the cities above referred to.

It was then agreed that the City would lease to GBRA the Comal plant and the distribution system above referred to for a peroid of thirty years, with the option to GBRA to purchase the same at the end of the thirty-year period. All rights to be acquired by the City in the properties of SAPSCo were to be subject to the rights of GBRA as evidenced by the lease contract. The property to be leased to GBRA was valued at approximately seven and one-half million dollars. GBRA was to pay the City an annual rental of $262,581.00, less certain fixed liabilities outstanding against the plant which GBRA agreed to assume and pay. The generating plant known as Station "B," located in the City of San Antonio, was to be owned and operated by the City and was to carry the base load of the demands of the City's electric system, but it was recognized that it would not be sufficient to supply these needs in full. Consequently, the City agreed to buy from GBRA at a stipulated price such additional current as it might need and as could be supplied by GBRA. It was further stipulated, however, that the City could enlarge the generating capacity of Station "B" and thus decrease the amount of current to be purchased from GBRA upon two years' advance notice to GBRA of its intentions to do so, provided, however, that the City's monthly billing demand could not be reduced below 25,000 kilowatts per month at 90¢ per kilowatt.

The mechanics by which this was to be accomplished were as follows: The City was to issue and sell its bonds in the sum of approximately 34 million dollars and use the funds to purchase the outstanding stock of SAPSCo. The Trustees in Dissolution of SAPSCo were to convey all the assets of SAPSCo to the City. The City was to convey to Poth, Stockdale, and Floresville the distribution systems within those cities for a stipulated price. A new corporation known as the Guadalupe Electric Company was to be set up and the distribution systems within the cities of New Braunfels, Hondo, and Boerne were to be conveyed to that company, with an understanding that it would in turn, upon request, convey same to said cities at a stipulated price. The City was to execute a bond indenture covering the remainder of the property being acquired, including the Comal plant, and pledging the revenues of the system as security for the bonds, and at the same time was to execute the lease, with option to buy, to GBRA covering the Comal plant and the distribution system used in connection therewith. The lease to GBRA was to be non-assignable except with the consent of the City, but as a part of the compromise the City agreed that it might be assigned to LCRA. All these contracts were to be executed at the same time.

The parties were dealing at arm's length. Neither one was willing to perform his part and trust the other to perform at a later date. Consequently, the parties all met on October 24th for the purpose of concluding the transaction at a single sitting. Representatives of the City, GBRA, LCRA, SAPSCo, Harris Trust & Savings Bank, who was a trustee named in the bond indenture, the investment bankers employed by the City to aid in making the trade, the attorneys for the bond buyers, a representative of the Attorney General's Department, and numerous others were present. Representatives were sent to the various county seats where the suits were pending, for the purpose of having the suits dismissed at the proper time. When the parties were fully agreed, these representatives were instructed, by telephone, to dismiss the suits. As the judges entered their orders dismissing the suits, this information was relayed, by telephone, to the Mayor and when all suits had been dismissed the Mayor executed the lease in favor of GBRA. He then executed the "non litigation" certificate and delivered it to the representative of the Attorney General's Department. The Attorney General approved the bonds and the Mayor delivered the bonds to the purchaser. The consideration was delivered to SAPSCo and its assets were conveyed to the City. All of the instruments necessary to conclude the transaction were executed and deliv-

ered. The then Mayor testified that after the papers had all been executed and the suits dismissed, "we swopped papers." In this manner the entire matter was concluded at the same time and as a single transaction.

As previously stated, the object of this suit was to set aside the lease contract on the ground that it constituted an encumbrance on the City's light system without the approval of the qualified voters of the City.

The City's Board of Trustees in charge of its electric system brought a prior suit to cancel the same lease contract. The Court of Civil Appeals in a majority opinion held that the contract was valid, but also held that the trustees were without authority to maintain the suit. Guadalupe-Blanco River Authority et al v. Tuttle et al, 171 S. W. (2d) 520. This Court refused an application for writ of error "For Want of Merit" on the ground that the trustees had no authority to prosecute this suit, but at that time declined to pass on the validity of the contract. Tuttle et al v. Guadalupe-Blanco River Authority et al, 141 Texas 523, 174 S. W. (2d) 589.

■ Revised Statutes, Article 1112, relied on by the City, reads in part as follows:

"No such light, water, sewer, or natural gas systems, parks and/or swimming pools, shall ever be sold until such sale is authorized by a majority vote of the qualified voters of such city or town; nor shall same be encumbered for more than Five Thousand ($5,000.00) Dollars, except for purchase money, or to refund any existing indebtedness lawfully created, until authorized in like manner."

It is clear from the language of the statute that it was not intended to prohibit the acquisition of a light system subject to an existing encumbrance, nor the creation of an encumbrance as a condition to the acquisition of such property, without a vote of the qualified voters. City of Dayton v. Allred, 123 Texas 60, 68 S. W. (2d) 172, par. 2.

■ Under the facts heretofore set out, the purchase of the property of SAPSCo by the City and the lease of part thereof—Comal plant—to GBRA constituted a single transaction. It is true the conveyance to the City and the lease to GBRA were evidenced by separate instruments, but these instruments were all executed at the same time as the result of a common understanding to

consummate one over-all transaction, and are therefore to be construed together as one contract. The Howards v. Davis, 6 Texas 174; Veal v. Thomason, 138 Texas 341, 159 S. W. (2d) 472; American National Bank v. American Loan & Mortgage Co. (Com. App.), 228 S. W. 169; Spillman v. Hibler (Civ. App.), 60 S. W. (2d) 1103; Rev. Stats., Art. 3713, Common Law Rules of Evidence, Rule 21 (Vernon's Ann. Civ. Stats.).

■ At the very time the City acquired title to the property, it acknowledged the right of GBRA to the lease contract. In fact, the City expressly acknowledged in the lease contract that it was acquiring the property subject to the rights of GBRA as expressed therein. In this respect the lease provided: "The City of San Antonio has entered into a contract and has formulated a plan under which it proposes immediately to acquire all of said electric properties, except electric distribution properties serving the Cities of New Braunfels, Hondo and Boerne and territory immediately adjacent thereto, *subject to the rights, privileges and agreements conferred on the Authority (GBRA) under the terms and provisions of this contract.*" (Italics ours.) The City had to acknowledge the right of GBRA to the lease as a condition to its right to acquire the property. The lease was a part of the burden which the City assumed in the acquisition of the property. Under these circumstances the City acquired the property subject to this encumbrance. Monroe & Bro. v. Buchanan, 27 Texas 241; Lasater v. Premont (Civ. App.), 209 S. W. 753 (writ refused); Spillman v. Hibler (Civ. App.), 60 S. W. 1103. We therefore hold that it was not necessary to secure the approval of the qualified voters in order to authorize the execution of the lease contract.

■ What has been said above applies with equal force to the City's contention that the lease contract violates the provisions of Article 1115, R. C. S. 1925. That Article provides in part as follows: "The management and control of any such system or systems during the time they are encumbered, may by the terms of such encumbrance, be placed in the hands of the city council of such town, or may be placed in the hands of a board of trustees to be named in such encumbrance, consisting of not more than five members, one of whom shall be the mayor of such city or town." It is contended that the City had the right to place the entire light system acquired by it, including the Comal plant, in the hands of its Board of Trustees, and that the lease contract, in sofar as it places the Comal plant under the control of GBRA, is in violation thereof. The statute, however, applies

only to the rights acquired by the City. As previously pointed out, the City acquired its title to the light system subject to the terms of the lease contract and burdened therewith. The lease contract placed the management of the leased property in the hands of the lessee, and the City had to agree to this encumbrance as a part of the consideration for the acquisition of the property. Therefore, whatever right the City has to have its Board of Trustees manage its light system is subject to the prior right of the lessee to manage the leased property under the terms of the lease.

■ It is further contended, in effect, that fraud was perpetrated upon the City in the acquisition of the lease contract and that the transaction constitutes an "unconscionable transaction as against the City." This charge is based on the fact that one Mr. Eames advised the City at the time the contract was entered into that it would be to the advantage of the City to the amount of approximately $150,000.00 per year to make the contract, whereas subsequent developments disclosed that it would have been to the advantage of the City to the amount of approximately one-half million dollars per year if it had not made the lease contract.

The facts disclose that the City employed a group of investment bankers to aid in the purchase of the property and in the sale of its bonds. These bankers were to be paid a contingent fee of $1\frac{1}{2}$ per cent of the purchase price of the property. This fee actually amounted to $509,000.00. The investment bankers were to employ the necessary engineers to assist in the project. These engineers were to be selected with the approval of the City. The engineering firm of Loeb & Eames was employed for this purpose. Presumably, this was done with the approval of the City. During the negotiations Mr. Eames examined the books of SAPSCo to ascertain the extent of earnings during the preceding year. From this he made up a statement showing prospective earnings in the future. Based on past earnings, he concluded, and so advised the City, that it would be to the advantage of the City, to the extent of approximately $150,000.00 per year, to make the lease contract. After the transaction was concluded the City refused to deliver the Comal plant to GBRA, but retained it and operated it during the year 1943, and according to the earnings under its management the City earned approximately $500,000.00 more than it would have earned if the plant had been operated under the lease contract. It is asserted that since the investment bankers' contract with the City

was on a contingent basis, it was to their interest for their employee, Mr. Eames, to so misrepresent the facts to the City.

It will be observed, however, that Mr. Eames was an employee of the investment bankers, and not of GBRA, and that there is no evidence of any collusion between Mr. Eames and GBRA. GBRA was not responsible for any misrepresentation made by Mr. Eames. It will be further observed that Mr. Eames' statement was not a misstatement of fact. It was a mere prediction of prospective earnings based on past performances. There is no evidence that it was false, other than the fact that under the City's management actual earnings did not accord with Mr. Eames' predictions. When the statement was presented to the City Commissioners, they were not satisfied to rely on Mr. Eames' estimate. They called upon Colonel Tuttle, a local engineer who had been in charge of SAPSCo, to verify the estimate. He checked the figures and stated that if the basic figures taken from the books of SAPSCo, and upon which Mr. Eames had relied, were correct, the estimate was sound. There is no showing that the basic figures had not been correctly transcribed.

Furthermore, the record shows that the system acquired by the City actually earned a net profit to the City, during the year 1943, of more than two million dollars after deducting all expenses and a liberal allowance for depreciation. Presumably, it will pay like dividends during the years to come. Certainly the entire transaction was not an "unconscionable transaction as against the City" as now contended for by the City. The City is seeking to cancel the lease only. It does not offer to surrender the entire consideration received by it and restore the status quo. It seeks to retain the beneficial part of the transaction and to repudiate the disadvantageous part because of the alleged fraud of the other party. This it may not do. 17 Tex. Jur. 135; 31 C. J. S. 347; Doty v. Barnard, 92 Texas 104, 47 S. W. 712.; Monroe & Bro. v. Buchanan, 27 Texas 241; Lasater v. Premont (Civ. App.), 209 S. W. 753.

▮ The lease contract provided that neither party should have the right to assign the lease without the consent of the other. GBRA assigned the lease to LCRA and the City consented to the assignment. The consideration for the assignment was that LCRA assumed all of the obligations of GBRA as embodied in the lease, and in addition agreed to pay GBRA the sum of $250,-000.00 per year and one-half of the net profits. The full consideration for the assignment was not disclosed to the City at the

time it consented to the assignment, and this is urged as a ground of fraud.

The purpose in requiring the consent of the City to the assignment was to retain in the City the right to determine with whom it would have to deal in securing performance of the contract. The City was in nowise interested in the consideration to be received by GBRA for the assignment, and it suffered no injury by reason of the fact that it was not informed as to the full consideration therefor.

■ As previously stated, the lease contract covered the steam-operated electric generating plant at New Braunfels as well as various transmission lines, poles, transformers, meters, and other equipment. The City insists that the contract is ultra vires on the ground that GBRA had no authority to own and operate a steam-operated plant for the manufacture and sale of electric energy.

The purpose for which GBRA was created was "the control, storing, preservation and distribution of the waters of the * * * River and its tributaries for irrigation, power and other useful purposes, the reclamation and irrigation of arid, semi-arid and other lands needing irrigation, and the conservation and development of the forests, water and hydro-electric power of the State of Texas." The Act creating it authorizes the Authority "to acquire by purchase, lease * * * and to maintain, use and operate any and all property of any kind * * * within or without the boundaries of the District, necessary or convenient to the exercise of the powers, rights, privileges and functions conferred upon it * * *." It is further given the authority "to use and operate, any and all facilities of any kind necessary or convenient to the exercise of such powers, rights, privileges and functions" and "to do any and all other acts or things necessary or convenient to the exercise of the powers, rights and privileges conferred upon it by this Act or any other Act or law." The Act provides that its terms shall be liberally construed to effectuate the purposes set forth therein. Acts 1933, 43rd Leg., 1st C. S. p. 198, ch. 75, as amended by Acts 1935, 44th Leg., 1st C. S., p. 1615, ch. 410. See Lower Colorado River Authority v. Chemical Bank & Trust Co. (Civ. App.), 185 S. W. (2d) 461, affirmed 144 Texas 326, 190 S. W. (2d) 48. The testimony shows that the operation of a steam-operated generating plant to "firm up" or supplement hydro-electric power is a well-recognized method by which hydro-electric power may be manufactured and sold to the best advantage. In fact, the testimony shows that this is

essential where the rainfall is irregular, as it is in this State. In the light of this testimony it was clearly within the power of the Authority to lease or own and operate the steam plant.

■ Moreover, as previously pointed out, a part of the consideration paid or burden assumed by the City in the acquisition of properties of SAPSCo was the granting of the lease contract here under consideration. GBRA agreed to dismiss its suit and to abandon its efforts to buy the properties if the City would execute the lease. GBRA has fully performed this part of the contract. The contract by which the City acquired the property is a very beneficial one to the city. Having accepted and retained the beneficial part of the contract, it cannot now reject the disadvantageous part by pleading the mere want of corporate power of the other party to enter into the contract. Bond v. Terrell Cotton & Woolen Mfg. Co., 82 Texas 309, 18 S. W. 691, and authorities there cited; Staacke v. Routledge, 111 Texas 489, 241 S. W. 994; 19 C. J. S. 438.

■ The last point relating to invalidity of the lease which we shall discuss is the City's contention that the lease creates an unlawful monopoly in favor of GBRA. The City proposed to operate an electric system for the purpose of meeting its own needs and the selling of current to its citizens. It was undertaking to contract for the current necessary to operate this system. It was contemplated by the parties that generating Station "B," which was to be operated by the City, would carry the base load of the City's requirements but that it would be insufficient to meet the full demand of the City's electric system. The additional energy necessary to meet these demands was to be supplied as far as practicable by GBRA. On this point the contract provided as follows:

"Sec. 1. The Authority agrees to supply and the City agrees to take and pay for all of the power and energy requirements of the City up to a maximum requirement of 66,000 kilowatts over and above that supplied by its Station 'B,' and such additional power and energy as the City may require and the Authority may have available."

Section 4 of the contract stated that the City proposed to install in Station "B" an additional generator with a capacity of 25,000 kilowatts, and Section 5 provided in part as follows:

"Sec. 5. If the City should at any time during the term of this contract contemplate a reduction of its peak load requirements by reason of the installation of additional capacity at its Station

'B' in excess of the twenty five thousand (25,000) kilowatt unit provided in Section 4 of this Article V, it shall give written notice to the Authority not less than two (2) years prior to the estimated date of the completion of such installation, stating the capacity of the unit to be installed, the estimated date when the City will begin the operation thereof, and the amount of the reduction of the one hour peak load requirements to be furnished to the City by the Authority to become effective when the new unit is put in operation; * * *."

Section 12 of the contract bound the City to take a minimum demand of 25,000 kilowatts at a cost of $270,000.00 per year.

As we view the above contract, it is nothing more than an agreement by the City to purchase from GBRA all of the energy necessary for the full operation of the City's electric system over and above that which could be supplied by the City. It has been held that such a contract does not constitute an unlawful monopoly. Cox, Inc. v. Humble Oil & Refining Co. (Com. App.), 16 S. W. (2d) 285; Jones Investment Co. v. Great Atlantic & Pacific Tea Co. (Com. App.), 65 S. W. (2d) 495; Twaddell v. H. O. Wooten Grocer Co., 130 Texas 42, 106 S. W. (2d) 266. While the contract was to run for a period of thirty years, the City had the right, upon reasonable notice, to enlarge the capacity of its own plant by the installation of additional equipment and thus reduce the amount that it was to purchase from GBRA to the minimum of 25,000 kilowatts. In view of the nature of the business, the provision for two years' advance notice of the City's intention to reduce its demands upon GBRA was not an unreasonable one. The minimum demand of 25,000 kilowatts was a reasonable "stand by" charge. .

The City, which is a home rule city, undoubtedly had the right to contract for the current necessary for the full operation of its electric system. Rev. Stats., Art. 1175, Sec. 14. City of Brenham v. Brenham Water Co., 67 Texas 542, 4 S. W. 143. The contract does not purpose to prohibit the City from granting a franchise to any other concern to operate an electric system within the City. It is true the indenture entered into by the City with the bondholders provides that "the City will not grant a franchise for the operation of any competing electric system or gas system in the City of San Antonio until all bonds issued hereunder have been retired." But we do not understand that the City is seeking to cancel that provision of the indenture in this suit. It is seeking only to cancel the lease contract which contains no

such inhibitions. In our opinion the contract did not create any unlawful monopoly.

We are of the opinion that the trial court correctly rendered judgment for the defendants GBRA and LCRA on the City's suit to cancel the lease contract and the assignment thereof to LCRA.

■ The Board of Trustees of the San Antonio Electric and Gas System and Harris Trust and Savings Bank and Harold Eckhart, who were named in the bond indenture as trustees for the bondholders, were made parties defendant in the suit brought by the City and they filed a cross-action for declaratory judgment defining their rights under the indenture in relation to the property covered by the lease contract. They contend that there are certain conflicts between the terms of the indenture and the lease contract which require construction by the court. The trial court refused their prayer for such declaratory judgment and they have appealed.

On a former appeal it was held that the Board of Trustees of the City's light and gas system had no right to prosecute a suit of this nature. Tuttle v. Guadalupe-Blanco River Authority, 141 Texas 523, 174 S. W. (2d) 589. Therefore the trial court properly refused to grant a declaratory judgment in their favor. We will consider the prayer for a declaratory judgment by the trustees of the bondholders.

Article II, Section 2, of the lease reads in part as follows:

"Sec. 2. The provisions of this Agreement are recognized and declared to be subject to all of the terms of that certain indenture dated August 1, 1942, by and between the City of San Antonio and Harris Trust and Savings Bank and Harold Eckhart, as trustees, in all respects with like force as though the bonds secured by said indenture had been delivered and outstanding on the date of the execution of this agreement, and if any provision or provisions hereof or the obligations of the City hereunder shall be determined by any court of competent jurisdiction to be in conflict with any terms which may appear in said indenture, the trustees under such indenture may enforce the provisions thereof as if the conflicting provision or provisions of this contract were void. All rights and remedies given bondholders by said indenture shall be fully enforceable against the leased properties, and if default shall ever occur in the payment of either principal or interest on any of the bonds secured by

said indenture, all rights and remedies provided in said indenture may be enforced as if this agreement had automatically terminated and become void.

As between the parties hereto, it is understood and agreed that the City shall promptly perform all covenants, agreements and obligations imposed on it by the terms of the aforesaid indenture (except such as are specifically assumed herein by the Authority), and that the City will promptly pay off and discharge, as it becomes due and payable, all indebtedness secured by said indenture. In the event of default on the part of the City, the Authority may, at its own expense, remedy such default or defaults and shall thereupon, to the extent of its performance of the City's obligations under said indenture, be subrogated to the rights and remedies of the trustees or bondholders growing out of such default, without limitation of the Authority's right to any other remedies."

■ The indenture provides that "the complete management and control of the system during such time as any of the bonds herein authorized are outstanding and unpaid shall be in the hands of * * * the Board of Trustees of San Antonio Electric and Gas System"; whereas the lease contract provides that GBRA "shall have the free and uninterrupted possession and enjoyment of the (leased) property subject to the conditions of the lease," and that the management and control of the property acquired by the City "by the City's Board of Trustees of the San Antonio Electric and Gas System shall be subject to all the terms and provisions of this contract." It is contended by the Trustees named in the indenture that there is a direct conflict between the above provisions of the lease and the indenture as to who shall have the management and control of the leased property during the term of the lease.

If the indenture and the lease contract constituted separate and distinct contracts there might be a conflict between the provisions of the two instruments in the respect contended for. But, as previously pointed out, the instruments were all executed at the same time in the consummation of one over-all transaction and are to be construed together. The evidence shows, without dispute, that the attorneys and representatives of the City, the bond buyers, the trustees named in the indenture, and the lessees were present while the various instruments, including the lease contract, were being prepared. Hence the bond buyers and the trustees named in the indenture knew at the time the transaction

was closed that the lease had been executed, and that under its terms the lessee was to have the control and management of the leased property during the term of the lease. In fact, the purpose of the lease could not be accomplished without allowing the lessee to have control of the leased property. We must presume that the parties intended that this part of the contract should be carried out.

While the indenture provides generally that the electric light system acquired by the City shall be under the management and control of the City's Board of Trustees, the lease provides specifically that in so far as the leased property is concerned the control and management thereof by the Board of Trustees "shall be subject to" the terms of the lease. Very clearly, the parties contemplated that this more specific provision contained in the lease contract should control the general provision contained in the indenture. We hold that the right of the City's Board of Trustees to manage and control the leased property is subject to the terms of the lease.

The indenture provides that "all revenues of every nature received through the operation of the system shall be deposited as received in a special fund or account to be known as * * * the 'Revenue Fund,'"; that the money in the "Revenue Fund" shall be used "to pay the current expenses of operating, maintaining, and repairing the system"; that "after the cost of the maintenance and operation have been paid from the Revenue Fund * * * the next available money therein shall be used for and are hereby pledged to the payment of the principal of and interest on the bonds * * *"; and that all money held in the "Revenue Fund" "shall be held as trust accounts for the benefit of the holders of the bonds." On the other hand, the lease contract clearly contemplates that GBRA shall pay the City a stipulated sum as rental for the use of the leased property and that all revenues accruing from the operation of this property, over and above the stipulated rental, shall be retained by GBRA. The trustees named in the indenture contend, in effect, that they are entitled to have all profits earned by the lessee in the operation of the leased property paid into the "Revenue Fund" and held for the benefit of the bondholders.

Again, the indenture and lease must be construed together and their provisions harmonized if possible. At the time the transaction was closed the bond buyers and the trustees named in the indenture knew that the City was to receive a stipulated

rental for the use of the leased property, and that this was the only revenue which the City was to receive for the use thereof during the term of the lease. They knew that all profits on this property, over and above the rental, were to be retained by the lessee. They consented to this arrangement. When the indenture and the lease are construed together and their provisions harmonize, we think it is clear that they can mean that the City is to receive the sum stipulated in the lease as the earnings from the leased property, and that this is the revenue which is to be paid into the "Revenue Fund" as the earnings from the operation of the property. It was not contemplated that the profits made by the lessee in the operation of the leased property, over and above by the stipulated rental, should also be paid into the "Revenue Fund."

■ By express provisions of the lease the rights of the bondholders are superior to the rights of the lessee as against the leased property in the event of a foreclosure.

The judgment of the Court of Civil Appeals is reversed and the judgment of the trial court in denying the City any recovery in its suit to cancel the lease contract and the assignment thereof and in refusing a declaratory judgment is favor of the Board of Trustees is affirmed. The judgment of the trial court in refusing a declaratory judgment in favor of the trustees for the bondholders is reversed and judgment is here rendered construing the rights of said trustees under the indenture and lease contract as set out in this opinion.

Opinion delivered February 26, 1947.

MR. JUSTICE SLATTON, dissenting.

My views concerning the proper disposition of this case are contained in the majority opinion of the Galveston Court of Civil Appeals, which was edited by Chief Justice Montieth. 191 S. W. (2d) 118. I therefore enter my dissent to the opinion of this Court.

Opinion delivered February 26, 1947.

ON REHEARING.

MR. CHIEF JUSTICE ALEXANDER delivered the opinion of the Court.

■ In the original opinion we stated that the bond indenture was

executed at the same time the other instruments were executed. In the motion for rehearing it is pointed out that, while the bond indenture was delivered at the same time the other instruments were executed, it was actually signed and acknowledged several days prior thereto. However, in our opinion, this is not material. As a general rule, delivery is an essential element of the execution of a written instrument. 17 C. J. S. 414; 10 Tex. Jur. 267; 15 Words and Phrases 546; Black's Law Dictionary (De Luxe Ed.), p. 716; Thomason v. Berry (Com. App.), 276 S. W. 185; Planters' Oil Co. v. Hill Printing & Stationery Co. (Tex. Civ. App.), 208 S. W. 192. Prior to the time the other instruments were executed and delivered and the transaction closed, the City had not acquired the property to be covered by the indenture, and had not received the consideration to be paid therefor. Consequently, although the indenture was actually signed at a prior date, it was not intended that it should be delivered nor that it should become effective until the other instruments were executed and delivered. Therefore, for all practical purposes, we may consider that the indenture was executed at the same time the other instruments were executed and delivered.

■ It is strenuously insisted that, since the lease contract and the indenture were between different parties—the lease being between the City and GBRA and the indenture being between the City and the bond buyers and the trustees named therein—they should not be construed together as one instrument. It is undisputed, however, that all of the instruments were prepared and entered into in the accomplishment of a single purpose. Representatives of all of the parties—the City, GBRA, the bond buyers, and the trustees named in the indenture—met in the same room, at the same time, for the purpose of closing the over-all transaction. At that time they recognized that the City could not acquire the property to be covered by the indenture, and therefor could not issue and sell the bonds unless it would consent to execute the lease to GBRA. Consequently, it was agreed that the City should make the lease to GBRA in order to put the City in position to issue its bonds and acquire the property to be covered by the indenture. The indenture, the lease, and the other instruments were all executed and delivered with the full knowledge of all of the parties, in carrying out the agreement entered into by them. The lease expressly refers to the indenture. Under these circumstances they must be construed together, in order to ascertain the true intent of the parties. Veal v. Thomason, 138 Texas 341, 159 S. W. (2d) 472; Peterson v. Miller Rubber Co., 24 Fed. (2d) 59; 12 Amer. Jur. 783.

The trustees named in the indenture insist that, since Article II, Section 2, of the lease (quoted in the main opinion) provided that the provisions of the lease were subject to the terms of the indenture, and in the event of a conflict the terms of the indenture should control, the provisions of the indenture placing "the complete management and control of the system" in the hands of the City's Board of Trustees should control over the provisions of the lease which gave the lessee the right to operate the leased property, and that the provisions of the indenture requiring the proceeds of the system to be paid into the "Revenue Fund" should control over the provision of the lease which allows the lessee to retain the profits derived from the operation of the leased property. Of course, the complete management and control of the leased property could not be in the lessee and in the City's Board of Trustees at the same time. Neither could the profits from the leased property be retained by the lessee and at the same time be paid into the "Revenue Fund." But a 'lease such as this, stripped of the right to manage the leased property and to retain the profits over and above the stipulated rental, would be no lease at all. It would be worthless. Its terms would be rendered ineffective. We must assume that the parties honestly intended that the terms of the lease contract should be effective to accomplish the purpose therein indicated. We cannot assume that the City, the bond buyers, and the trustees named in the indenture agreed to the execution and delivery of the lease in order to accomplish their purpose, but at the same time secretly intended that the lease should be wholly ineffective. We must attribute to them honest motives. Consequently, we must try to reconcile the different provisions of the instruments and give effect to all of them, if possible. This can be done by holding that in the acquisition of the property all parties intended that the leased property should be burdened with the lease and that it was only the interest acquired by the City, over and above this burden, that was to be under the management and control of the City's Board of Trustees. The same construction would give the trustees named in the indenture the right to have the stipulated lease rental paid into the "Revenue Fund" as revenue received by the City through the operation of the system, but not the profits earned by the lessee over and above the stipulated rental. Such a construction gives effect to the terms of the various instruments and it accords honesty of purpose to all the parties.

The motion for rehearing is overruled.

Opinion delivered April 2, 1947.

Second motion for rehearing overruled May 1, 1947.