614 F.2d 1009
 MODERN AMERICAN MORTGAGE CORP. and First Federal Savings &
Loan Assoc., Plaintiffs-Appellants, Cross-Appellees,
v.
SKYLINE PARK, a Texas General Partnership, et al.,
Defendants-Appellees,
v.
George W. TUCKER, d/b/a Empire Construction Co.,
Defendant-Appellee, Cross-Appellant.
 No. 78-1410.
 United States Court of Appeals,
Fifth Circuit.
 April 2, 1980.
 
 Jay M. Goltz, Dallas, Tex., for plaintiffs-appellants, cross-appellees.
 Crocker & McDonald, Toy A. Crocker, Dallas, Tex., for George W. Tucker.
 Blankenship & Potts, Hal Potts, Ralph W. Currie, Dallas, Tex., for Skyline Park, Sam A. Leake, and Sarah H. Leake.
 Appeals from the United States District Court for the Northern District of Texas.
 Before MORGAN, REAVLEY and HATCHETT, Circuit Judges.
 HATCHETT, Circuit Judge:
 
 
 1
 This appeal concerns a mortgagee, owner, and contractor, in a contractual dispute relating to the Federal Housing Administration's Insurance of Mortgages under the National Housing Act, 12 U.S.C. § 1701 et seq. The district court in a diversity judgment granted relief against the appellee contractor but denied relief as to the appellee owner. Because our interpretation of the contract finds the mortgagee responsible for its own loss, we find neither the owner nor the contractor liable. Accordingly, we affirm in part and reverse in part.
 
 
 2
 Appellant, Modern American Mortgage Corp., the Lender, is the mortgagee. Appellee, Skyline Park, a Texas General Partnership, (Sam A. Leake, individually, Sarah H. Leake, individually) is the owner. Appellee, George W. Tucker, d/b/a Empire Construction, is the contractor.
 
 
 3
 On November 17, 1970, FHA issued its Commitment for Insurance of Advances for the private financing of a mobile park, Skyline Park. Pursuant to this commitment, a mortgage loan transaction, consisting of a Building Loan Agreement, Construction Contract, Completion Assurance Agreement, and Note and Deed of Trust, was executed and delivered between the mortgagee, the owner, and the contractor.
 
 
 4
 The Building Loan Agreement contains the basic terms and conditions under which the mortgagee was responsible for advancing funds for the construction of the project. The only parties to the agreement were the mortgagee and the owner. The agreement provides that the mortgagee would make the loan, that the owner would complete the project by November 8, 1971, and that the owner would furnish the mortgagee the assurance of completion in the form specified by FHA regulations. 24 C.F.R. § 207.19(c)(7).*
 
 
 5
 The Construction Contract was between the owner and the contractor. It states that the contractor should furnish to the owner a Completion Assurance Agreement, in the amount of $49,643. Article 6 says "Such assurance of completion shall run to the Owner and Lender as obligees and shall contain a provision whereby the security agrees that any claim or right of action that either the Owner or Lender might have thereunder may be assigned to the Commissioner." The Construction Contract defines substantial completion as the "date that the FHA Chief Underwriter signs the final Project Inspection Report." The Construction Contract further states that in the event of failure of the owner to perform his obligations to the mortgagee, and "in the event the mortgagee elects not to undertake completion, the contractor's obligations under this contract shall terminate."
 
 
 6
 The Completion Assurance Agreement provides that the contractor deposit with the mortgagee a fund of $49,643, in the form of an irrevocable letter of credit, to assure the contractor's completion of the project. The agreement states that this fund was to be used by the mortgagee "to indemnify the Owner or the Lender, as the case may be, for any expenses, loss or damage suffered or sustained as the result of any default by the contractor in the performance of the Construction Contract." (Emphasis added). The fund could only be disbursed upon prior written approval of the Federal Housing Commissioner, or his authorized agent. The agreement states that it was additional security for the performance by the contractor of his obligations.
 
 
 7
 The Note and Deed of Trust, states that the owner assumed no personal liability for the payments.
 
 
 8
 The Completion Assurance Agreement letter of credit expired in part on June 1, 1972, and in full on June 1, 1973. The mortgagee requested more than once that the contractor renew the letter of credit, but such requests were refused.
 
 
 9
 Though the project was essentially completed from a construction perspective, problems with the utility hook-ups, beyond the scope of this suit, prohibited the FHA Chief Underwriter from signing the final Project Inspection Report.
 
 
 10
 The mortgagee was in default in March, 1974, by reason of nonpayment of principal, interest, and escrow funds, and the property was foreclosed at a sale conducted under the loan documents. After foreclosure, the FHA deducted the amount of the assurance of completion fund from the amount the mortgagee was otherwise entitled to under the FHA Mortgage Insurance.
 
 
 11
 The mortgagee brought this action to establish joint and several liability against the owner and contractor for losses incurred after foreclosure and upon assignment of the mobile home project to FHA. Liability was sought to be established on the basis of the Building Loan Agreement, the Construction Contract, and the Completion Assurance Agreement.
 
 
 12
 After a non-jury trial, the district court found that the parties agreed that the owner's responsibility was confined to insuring the deposits of the irrevocable letter of credit in the amount of $49,643. The court found the contractor liable for the $49,643 and the owner not liable.
 
 
 13
 The trial court found liability on the basis that the contractor failed to fully perform the Construction Contract; that the contractor breached the Completion Assurance Agreement by not replacing the expired letter of credit; and that the contractor's failure to perform the Construction Contract was the cause of the mortgagee's loss.
 
 
 14
 The mortgagee accepts the trial court's finding concerning the contractor and additionally asserts that the contractor was liable until the project was completed.
 
 
 15
 This court must decide whether the trial court properly interpreted the contract. Our duty is to interpret the contract under the applicable law. Based on our interpretation, we affirm the finding of the trial court that the owner is not liable.
 
 
 16
 To determine whether the trial court properly found the contractor liable, we need decide: (1) whether the trial court erred in finding that the contractor failed to fully complete the Construction Contract; and (2) whether the trial court erred in finding that the contractor breached the Completion Assurance Agreement.
 
 
 17
 The parties agree that the Texas law is controlling. We are thus bound to interpret the four simultaneously executed documents as one contract, attempting to reconcile the various parts to discern the intent of the parties. Guadalupe-Blanco River Authority v. City of San Antonio, 145 Tex. 611, 200 S.W.2d 989 (1947); Republic Ins. Co. v. Hope, 557 S.W.2d 603 (Tex.Civ.App.1977).
 
 
 18
 Because this case involves a dispute in contractual interpretation where extrinsic evidence, in the form of relevant testimony, was considered, our standard of review is determined by Thornton v. Bean Contracting Co., Inc., 592 F.2d 1287 (5th Cir. 1979) where this court decided:
 
 
 19
 (Generally) the interpretation of a contract is a question of law, not fact, and appellate review is not limited to the 'clearly erroneous' rule. First National Bank of Miami v. Insurance Co. of North America, 495 F.2d 519 (5th Cir. 1974); Makofsky v. Cunningham, 576 F.2d 1223 (5th Cir. 1978). An exception to this rule is the situation in which extrinsic evidence has been used in interpreting an ambiguous contract. See Valley Cement Industries, Inc. v. Midco Equipment Co., 570 F.2d 1241 (5th Cir. 1978); Makofsky, supra.
 
 
 20
 592 F.2d at 1290.
 
 
 21
 We hold that the trial court was clearly erroneous in finding that the contractor failed to complete the Construction Contract and in finding that the contractor breached the Completion Assurance Agreement by not replacing the expired letter of credit. Fed.R.Civ.P. 52(a).
 
 I.
 
 22
 The contractor fully completed his obligation under the Construction Contract. Article 2D of the Construction Contract provides: "The date of substantial completion shall be the date the FHA Chief Underwriter signs the final Project Inspection Report . . . ." Under our interpretation of the contract, that definition of substantial completion is applicable only to the owner and mortgagee. The definition of substantial completion applicable to the contractor is found in art. 2C of the Construction Contract: "substantially completed in accordance with the Drawings and Specifications." The contractor finished everything called for in the drawings and specifications. He satisfied the definition of completion applicable to him. The mobile home park project was not completed because the utility companies failed to install the utility mains. The contractor was not at fault. He fully met his obligation to install the service lines to which the utility mains would connect. Both the owner and the mortgagee acknowledged that the contractor satisfied his Construction Contract obligations. At oral argument, the owner admitted that the contractor had fully performed. The owner also disclosed at oral argument, that in an affidavit in another lawsuit, he had admitted that the contractor not only completed the Construction Contract, but that the contractor had performed extra work in repairing certain damages done by the utility companies. The mortgagee also stated at oral argument that the contractor fulfilled his obligation. In its brief to this court, the mortgagee conceded that "there had never been a failure by Tucker to perform under the Construction Contract."
 
 
 23
 We conclude that the trial court erred in finding that the contractor had not fully performed.
 
 II.
 
 24
 The contractor did not breach the Completion Assurance Agreement. The contractor was under no duty to replace the expired letter of credit where the mortgagee elected not to undertake completion of the project. The Construction Contract provided that the "(T)he Lender may, as attorney-in-fact for the Owner, undertake the completion of the project in accordance with this Contract. In the event the Lender elects not to undertake such completion, the Contractor's obligations under this contract shall terminate." The Completion Assurance Agreement stated that "the Funds shall at all times be under the control of the Lender" and that the "Lender shall maintain such Fund . . . ." The mortgagee undertook this responsibility when it asked the contractor to renew the letter of credit.
 
 
 25
 The mortgagee was responsible for its own loss. It had a contractual duty to maintain the fund. Any obligation the contractor might have had was terminated when the mortgagee chose not to finish the project.
 
 
 26
 We agree with the trial court that the completion assurance fund was not solely for the benefit of the mortgagee.
 
 
 27
 The Completion Assurance Agreement stated that there can be no financing of the mobile home park "unless the Contractor shall first furnish proper assurance to the Owner and the Lender." The $49,643 fund is described in the agreement as existing "to secure or indemnify the Owner or Lender." (Emphasis added). The Construction Contract provided that "such assurance of completion shall run to the Owner and the Lender as obligees."
 
 
 28
 At oral argument the mortgagee acknowledged that the fund was for the benefit of both the mortgagee and the owner.
 
 
 29
 Consequently, we affirm the trial court's finding of no liability for the owner and reverse the finding of liability for the contractor.
 
 
 30
 AFFIRMED IN PART AND REVERSED IN PART.
 
 REAVLEY, Circuit Judge, dissenting:
 
 31
 By my reading of the agreements of these parties, Skyline is liable to Modern American for $49,643, the amount not paid to Modern American by FHA. I fail to see how the majority bases a contrary decision upon the letter of credit provision or its expiration.
 
 
 32
 These four simultaneously executed documents are to be construed together to determine the intent of the parties. This construction is purely and simply a question of law. "There is virtually unanimous acceptance of the proposition that the interpretation of a contract is a question of law, not fact, and, therefore, not restricted to review under the 'clearly erroneous' rule." Makofsky v. Cunningham, 576 F.2d 1223, 1229 n.7 (5th Cir. 1978); Thornton v. Bean Contracting Co., Inc., 592 F.2d 1287, 1290 (5th Cir. 1979). The court labels these contracts as ambiguous and therefore subject to the use of extrinsic evidence for interpretation and making that interpretation susceptible to a "clearly erroneous" standard of review, although the ambiguity is never isolated nor is the value of extrinsic testimony demonstrated. However, "(m)erely because the parties disagree upon the meanings of contract terms will not transform the issue of law into an issue of fact." General Wholesale Beer Co. v. Theodore Hamm Co., 567 F.2d 311, 313 (5th Cir. 1978). Each provision can be given its "reasonable, natural and probable meaning when considered in relation to the whole," and each can be "construed with reference to every other provision so that the effect of one upon the other may be obtained." Hennigan v. Charters Football Co., 431 F.2d 308, 315 (5th Cir. 1970).
 
 
 33
 The initial question is Skyline's obligation to Modern American. Under the Building Loan Agreement between these two, Skyline agreed to complete its mobile home project by November 8, 1971 (P 2, p. 56, Appendix) and furnish to the lender (Modern American) "evidence that all work requiring inspection by municipal or other governmental authorities having jurisdiction has been duly inspected and approved . . . and that all requisite certificates of occupancy and other approvals have been issued." (P 2(b), p. 58, Appendix). Paragraph 13 of the same document further provides that "the borrower (Skyline) shall furnish to the lender (Modern American) assurance of completion of the project in the form specified in the applicable FHA Regulations in effect on the date of this agreement." (Appendix, p. 63).
 
 
 34
 The final project inspection report was never signed by FHA. Skyline never completed the project as required by the contract with Modern American. FHA paid Modern American's mortgage insurance benefits except for $49,643 which is its damages recoverable from Skyline.
 
 
 35
 The majority holds that Skyline's obligation to Modern American terminated when Modern American chose not to complete the project and then lost the $49,643 fund which existed to indemnify the owner or the lender. Failing to examine the purpose of that fund, the majority holds that Skyline met its obligations to Modern American merely by causing its builder to provide a letter of credit to the lender equal to less than one-tenth of the total construction loan. This, mind you, was the only security for the lender because Skyline's liability on the promissory note could be discharged by surrendering the premises. The note explicitly states: "The maker (Skyline) assumes no personal liability for the payments hereof except as set out in the Deed of Trust of even date given to secure this indebtedness." (Appendix, p. 111). Modern American must have recourse against Skyline for the $49,643 withheld by FHA or Modern American's security interest in the project is frustrated despite the unambiguous language of the note. "Informed and experienced parties do not ordinarily bind themselves to unreasonable obligations," and have not done so here. Makofsky v. Cunningham, 576 F.2d at 1230.
 
 
 36
 The purpose of that fund was to protect the lender if it chose to step into owner's shoes and take over the actual completion of the project. Lender did not have to do this. It was an option. Lender could do as it did: sue Skyline for breach of contract.
 
 
 37
 Paragraph 9 of the Building Loan Agreement (Appendix, p. 61) gives Modern American the option either of terminating the agreement with Skyline on Skyline's breach or of taking possession of the premises and completing the project. Modern American chose the former.
 
 
 38
 Had Modern American elected to complete the project, Skyline would automatically appoint Modern American its "true and lawful attorney-in-fact, with full power of substitution in the premises, to complete the project in the name of the borrower (Skyline)." (Building Loan Agreement, P 9, Appendix, pp. 61-62). Paragraph 9(d)[1] of the Construction Contract (between Skyline and Tucker) provides that Modern American assumes all the rights and obligations against Tucker that Skyline would have, if Modern American elects to complete the project on Skyline's default.
 
 
 39
 In Article 6 of the Construction Contract (between Skyline and Tucker), the function of the completion fund is made explicit.
 
 
 40
 The Contractor shall furnish to the Owner assurance of completion of the work in the form of a Completion Assurance Agreement, FHA Form 2450, in the amount of $49,643.00. Such assurance of completion shall run to the Owner and the Lender as obligees and shall contain a provision whereby the surety agrees that any claim or right of action that either the Owner or Lender might have thereunder may be assigned to the Commissioner.
 
 
 41
 Appendix at 76.
 
 
 42
 This provision requires Tucker to furnish additional security to both Skyline and Modern American to insure that Tucker performs. It also provides that this fund "shall run to the Owner (Skyline) and the Lender (Modern American) as obligees . . . ." Skyline should be entitled to this fund if Tucker breached its contract with Skyline. Modern American would be an "obligee" and therefore entitled to the fund on Tucker's breach if Modern American were acting as the owner. That is, if Skyline breached its contract with Modern American, the latter per P 9 of the Building Loan Agreement, could step into Skyline's shoes to complete the project. If Tucker breached his contract, Modern American would be entitled to the funds as an obligee just as Skyline would have been.
 
 
 43
 That this $49,643 fund was merely designed as additional security for Tucker's performance, and nothing more, is reinforced by paragraphs 4 and 5 of the Completion Assurance Agreement (to which Modern, Skyline and Tucker were parties). Paragraph 4 provides that the fund is only payable if Tucker defaults. Paragraph 5 states that the fund is only designed to serve as additional security for Tucker's performance. These provisions are reprinted below.
 
 
 44
 4. Notwithstanding any of the provisions herein contained, it is expressly understood and agreed by all parties thereto that in the event of a default by the Contractor in any of its obligations under the Construction Contract, the entire Fund or balance remaining therein may, at the option of the Lender and the Commissioner, be paid to the Commissioner together with an assignment of all rights hereunder granted to the Lender and the Owner. The Contractor and Owner hereby consent to the transfer of the rights of the Lender hereunder by assignment in case any other Lender or Lenders should become the Owner or Holder of the mortgage.
 
 
 45
 5. This Agreement shall not alter or limit the obligations and liabilities of the Contractor under the Construction Contract, but shall be deemed to be merely additional security for the performance by the Contractor of the obligations thereunder.
 
 
 46
 Appendix at 83-84.
 
 
 47
 There is no indication in either of these paragraphs or in any of these documents that limits Skyline's obligation to Modern American to that of only insuring that this fund was provided. Skyline would be fully liable to Modern American if it breached regardless of the presence of this fund. This fund was only to serve as an inducement to Modern American to make the loan to Skyline because it helped insure that Skyline would be able to meet its obligation to Modern American even if Tucker failed to meet his obligation to Skyline. The opening paragraph of the Completion Assurance Agreement provides:
 
 
 48
 NOW THEREFORE, in consideration of the mutual promises and undertakings hereinafter contained, and for the purpose of inducing the Commissioner to insure advances of mortgage money during construction. . . .
 
 
 49
 Appendix at 81-82.
 
 
 50
 Modern American's failure to maintain the fund is therefore of no relevance. Because Modern American elected not to undertake the completion of the project, Tucker's obligation to Modern American properly terminated under P 9(d) of the Construction Contract as the majority states in Part II. Skyline, however, should remain fully liable to Modern American for breach of the Building Loan Agreement.
 
 
 
 *
 24 C.F.R. § 207.19(c)(7) provides:
 The mortgagee may accept, in lieu of a cash deposit required by paragraphs (c) (1), (3), (4), and (6) of this section, an unconditional irrevocable letter of credit issued to the mortgagee by a banking institution. In the event a demand under the letter of credit is not immediately met, the mortgagee shall forthwith provide cash equivalent to the undrawn balance thereunder.
 
 
 [1]
 That paragraph reads as follows:
 The Contractor understands that the work under this contract is to be financed by a building loan to be secured by a mortgage and insured by the Commissioner, and that the terms of said loan are set forth in a Building Loan Agreement between the Owner as Borrower and Modern American Mortgage Corporation as Lender. The Contractor further understands that said Building Loan Agreement provides that, in the event of the failure of the Owner to perform its obligations to the Lender thereunder, the Lender may, as attorney-in-fact for the Owner, undertake the completion of the project in accordance with this Contract. In the event the Lender elects not to undertake such completion, the Contractor's obligations under this contract shall terminate.
 Appendix at 77.