**CATE v. CATE et al.**

No. 14514.

Court of Civil Appeals of Texas. Dallas.

April 11, 1952.

Rehearing Denied May 9, 1952.

C. M. Smithdeal and Harry I. Freedman, both of Dallas, for appellant.

J. W. Hassell, of Dallas, for appellees.

CRAMER, Justice.

This suit was filed on the 12th day of April, 1949, by appellees, children of Mildred Joyce Cate and Hugh C. Cate, both deceased, against Madge Walden Cate, the second wife and present widow of Hugh C. Cate, deceased, and thereafter continued pending result of the case between the same parties reported in Tex.Civ.App., 235 S.W.2d 456, and tried after our judgment in said cause.

The first count was in trespass to try title to the joint property of appellees' parents at the time of the death of their mother. The second count was based upon an alleged oral agreement made by their parents during their lifetime and immediately before the execution by each of them of wills in which each left to the other all of their property, with the further provision that if the other were dead, then the property would go to their children. Appellees alleged that such disposition was made of the property by such wills under such express oral agreement between their parents that the survivor should, during his or her lifetime, have the right to possess, use, and dispose of such property for his or her maintenance, use, comfort, and support and that any property on hand at the time of the death of the survivor should become and be the property of appellees (their children) in equal parts. Appellees further alleged that such agreement was in parol made immediately before and on the same occasion as the execution by the parties of their joint, mutual, and reciprocal wills; that said agreement and plan was adopted for the benefit of appellees as well

as for the father and mother; that the wills each left their property to the survivor and if the other did not survive, then the property would go to their two children, appellees here; the only difference in the wills was a provision in Hugh C. Cate's will providing that the proceeds of a named policy of insurance on his life should go to his sister if she survived him (See Note 1). It was further alleged that the mother and father of appellees recognized such contract and after their mother's death their father probated their mother's will and received title thereunder to all of their mother's property. Appellees allege that in so doing, their father ratified and confirmed the agreement between him and their mother as well as the plan adopted with respect to their estates. They further allege that on or about April 1, 1944 their father married the appellant, Madge Walden Cate, and thereafter breached his contract with their mother by executing on or about June 29, 1944 a deed to appellant to Lot No. 9, in Block 12 of Forest Hills in the City of Dallas, Texas, which property was, prior to their mother's death, the homestead property of their parents; also that he breached his contract with their mother by thereafter on February 2, 1945 executing a new will in which all property, except $6,000 to each of the children, was left to his wife (appellant here); that appellant has taken charge of all of their father and mother's estate and is claiming title thereto; also plead alternative counts not necessary to state here.

Appellant answered, denying such allegations and affirmatively pleading the probate of the will and defenses hereinafter named. On the trial the jury returned a verdict on special issues, finding that: (1) On or about May 14, 1942 appellees' parents entered into an agreement as to the disposition of their estates as follows: That whichever one of them should survive would retain and keep for the use and benefit of their children such of their property as was not used by the survivor during his or her lifetime; (2) and each executed a separate will in consideration of such agreement; (3) said wills were intended by the said Hugh C. Cate and Mildred Joyce Cate to be one transaction to consummate their purpose as provided for in the agreement; (4) *it was not their intention that such wills should remain unrevoked for the benefit of the appellees herein*; (5) before Hugh C. Cate, now deceased, conveyed the Forest Hills property, Madge Walden Cate knew that such property was the homestead of Hugh C. and Mildred Joyce Cate; (6) before such conveyance of such homestead, it was the community property of Hugh C. and Mildred Joyce Cate; and (7) that Madge Walden Cate did not know before Hugh C. Cate conveyed the property in Block 359 to her that it was the community property of appellees' parents.

On such verdict the trial court entered judgment for appellees for the property involved, and appellant Madge Walden Cate has duly perfected her appeal to this Court.

Points 1 to 5, inclusive, assert error in the trial court's overruling of her motions for instructed verdict because (1) the uncontroverted evidence showed appellees' only claim rested on the parol agreement between their deceased father and mother, which was different from, and contradictory of, the terms of the last will of their father; (2) the appellant's title was under the last will of Hugh C. Cate, deceased, duly probated by a judgment still in full force and effect; (3) because appellees failed to show title in themselves and failed to show title outstanding in some third person; (4) in not discharging the jury and rendering judgment for appellant, appellees having failed to make a jury issue against her; and (5) in overruling appellant's motion for judgment n. o. v. Appellees counter with three counterpoints: (1) "The matter before this court in this appeal is the existence, nature and effect of the contract between H. C. Cate and Mildred Joyce Cate;" (2) the wills were executed as, and are, an integral part of the agreement, and any title taken under

---

1. The record shows the sister did not survive him.

the will is subject to said agreement; and (3) the will of Mildred Joyce Cate cannot be separated from the oral agreement, and construed as if standing alone, since to do so "would be not only to disregard the purpose and intent of the parties, but frustrate the same."

Appellant asserts under these points that the first three paragraphs of appellees' petition alleged that their father and mother made an agreement that the survivor of them should have the joint property for life to use and dispose of, but on the death of the survivor, that remaining should go to their children; that under the record here, evidence of the parol agreement was not admissible, and, if admissible, was not sufficient to support the verdict and judgment since appellees' pleadings alleged that " * * * under the statute of descent and distribution, under the terms of said contract and agreement, and under the terms of said will executed in pursuance thereof, (they) became entitled to all of said property and estate." Appellant in her brief states: "In other words, they say the title vested in them upon the death of Hugh C. Cate." Appellant further asserts that under the terms of the first wife's probated will, Hugh C. Cate received fee simple title to all the property involved and therefore appellees could not take from their mother.

If the children of Hugh C. Cate, by his first marriage, now own the property of their parents, they own it under the alleged oral agreement between their father and mother made immediately before the execution of their two separate wills and on the theory that said oral agreement became, with the two wills of the parties, part of one contract made up of the oral agreement and the two written wills executed under such oral agreement, and that such agreement created a trust in favor of appellees, binding on all parties after their father secured the probate of their mother's will. The material questions raised by these points are: (1) Was there a contract? (2) If so, what were its terms?

Paul Steed's evidence on the alleged oral agreement between appellees' deceased father and mother, although lengthy, will be quoted in full. It is as follows:

"Q. Prior to the 14th of May 1942 had you had any conversation with Mr. and Mrs. Cate with respect to what disposition they wanted to make of their property? A. Yes sir, I had.

"Q. Did they make any statements to you as to whether they planned, or wanted to fix it so that it would be kept within the family for the benefit of them and their children? A. Yes.

"Q. Will you state to the jury the substance of what they said to you in that respect as to the disposition of this property as it affected them and their children? A. Mr. Cate was in bad health and talked to me many times about a will he had already had prepared by some one. We talked about it at his house when my wife and I were visiting he and his wife, and we talked about it at my office several times. Finally Mr. Cate brought the will down to my office and we again talked it over and he at that time outlined to me what he wanted to do with his estate in case of his death, and he was in bad health at that time. Those conversations led up to my preparing a will for he and his wife. I prepared the will after talking with both of them, and after talking several times with Mr. Cate. I had my secretary draw the wills and we went over them and Mr. Cate he stuck them in his pocket and left. A week or maybe ten days after that he came back to my office accompanied by his wife, and at that time we had a forty-five minute or an hour's discussion about the wills and what they contained, how the property would be disposed of in case of his death first, or in the case of her death first. At the end of their discussion they said the wills were satisfactory, after I explained to them the best I could, just exactly what the wills meant. They had a good deal of conversation back and forth between

them in my presence, and which I didn't have any part in the conversation. At the end of that conversation they said they wanted to execute the wills. We needed two witnesses and we went into an adjoining office where myself and Mr. Joe Wilson, who is associated with me in business, helped them execute the wills and they were signed in our presence, and we signed in their presence, at the request of each of them as their last wills. Mr. Cate took the wills, and my recollection is that he gave them to his wife and she put them in her purse and they left. That is the last I ever saw them.

"Q. You say they were there forty or fifty-five minutes on the day that the wills were signed? A. That is my best recollection of it, Judge.

"Q. Did they or not go over the matter of what would become of that property on the death of the survivor of them? A. The principal thing they didn't understand was how when one of them died the property would pass to the children after the survivor of them died.

"Q. Did they discuss that feature of the will between themselves there at that time? A. They did.

"Q. State whether or not they agreed with each other there at that time that the property would go to the survivor to be handled and disposed of to the benefit of the survivor and at last to the children? A. They did, that was the whole conversation.

"Q. Now I believe you have said at that time the matter of the agreement as the will was drawn, was there before all three of you? A. That's correct, judge. We had a long discussion about whether the oil payments he was receiving in royalties and rent he was receiving on lots here in town, whether those payments would be interrupted by the making of these wills. What they didn't seem to understand was how the property would pass on to their children after the death of the

survivor or the death of the last one of them.

"Q. Did that lead to the incorporation in the will of the matter of executing a division order and things of that sort, in order that the pipe line companies would run the oil? A. That is correct. I tried to fix it so there would be no interruption in the receipt of the pipe line checks. We had a number of discussions about a long term lease on a lot out here that he was trying to lease to a company to install a filling station on, a twenty-five year lease with a stipulated rental. They both wanted to know how that would be handled upon the death of them, and would it be tied up in the Probate Court a long time, or if the children would have trouble collecting payments on that. I explained to them in the will I prepared that there would be as little delay as I knew how to fix it. It was for that reason we prepared the new will instead of the old will. The old will Mr. Cate had I didn't think was specific enough to satisfy an oil company, and there were other provisions he wanted to make in the will, in the new will.

"Q. Now that will was signed by them there, each of those wills was signed by them, at the same time of the agreement, is that right? A. They were signed in Joe Wilson's office. Both of them signed both of their wills. Joe Wilson and myself witnessed both of them.

"Q. Witnessed by the same parties? A. That's right, at the same time.

"Q. Mr. Steed I hand you a certified copy of an instrument. I wish you would look at it and tell the jury what it is? A. That is the will of Mrs. Mildred Joyce Cate that I prepared.

"Q. It is witnessed by you and Mr. Wilson? A. Witnessed by Joseph M. Wilson and myself, Paul Steed.

"Q. There at the time? A. At the time.

"Q. I believe you say you gave them to Mr. Cate after they were executed, and your recollection is Mrs. Cate took them and put them in her purse? A. After they were signed we visited awhile in Joe Wilson's office. I remember folding them up, the wills, then Cate, to my recollection, handed them to her and she put them in her purse. Anyway they carried the wills away and that is the last time I ever saw them.

"Q. Now I will ask you Mr. Steed, whether or not those wills were substantially duplicates of each other? A. They were exactly alike.

"Q. Will you look at exhibit B here, and at the same time the one you identified, and state whether or not that is a copy of the will executed by H. C. Cate?" The witness examined the instrument and said: "That is the same will, yes sir."

The will of Mildred Joyce Cate, omitting usual opening and closing provisions, reads as follows:

"2. I give, devise and bequeath to my husband, H. C. Cate, all property and estate of which I may die seized and possessed, whether real, personal or mixed, and wherever situated, if he survives me; otherwise I devise and bequeath the same to our two children, R. S. Cate and Mildred Joyce Cate Davis, share and share alike. This paragraph however is subject to the devise made in paragraph three hereof. 3. If at the time of my death I am not survived by my husband, and have not prior to my death collected the insurance herein mentioned, and have not paid the devise herein mentioned to Mary Lena Cate, then it is my will that out of the proceeds of a life insurance policy in which I am the beneficiary upon the life of my husband, H. C. Cate, which policy we both recognize as community property, there be paid as soon as can be collected to the said Mary Lena Cate, of Cleveland, Tennessee, the sum of Ten Thousand Dollars ($10,000.00). The policy I refer to is the policy in the State Life Insurance Company. 4. I hereby appoint my husband, H. C. Cate as executor of this will, if he survives me; otherwise I name, constitute and appoint my son, R. S. Cate. I direct that neither such Executor, or contingent Executor, shall ever be required to give bond or security, and it is further my will that no action be had in the Probate Court in the administration of my estate than to probate this will and to return an inventory and appraisement and list of claims in favor of my estate. 5. It is further my will that my executor, or contingent executor, in either instance or contingency, shall have full power and authority to sell, lease, assign, alienate and encumber, all or any part of my estate; and to execute and deliver Division Orders, Transfer Orders, and all other conveyances, transfers and releases, which either of them may deem necessary, with or without Warrant or Recourse; and to renew and extend any and all evidences of indebtedness, liens and encumbrances, whether same be in favor of, or a charge upon, my said estate; it being intended that such powers shall be in addition to, and their enumeration shall neither limit nor detract from, any and all specific powers, and general powers granted by law. 6. Should my husband not survive me, it is my will that my executor above named close up the affairs of my estate as promptly as in his judgment is for the best interest of he and my daughter, and distribute the estate in accordance with the terms of this will."

The will of H. C. Cate, omitting the usual opening and closing provisions, reads as follows:

"1. I direct that all of my just debts be paid. 2. I give, devise and bequeath to my wife, Mildred Joyce Cate, all property and estate of which I may die seized and possessed, whether real, personal or mixed, and wherever situated, if she survives me; oth-

erwise I devise and bequeath the same to our two children, R. S. Cate and Mildred Joyce Cate Davis, share and share alike. This paragraph however is subject to the devise made in paragraph three hereof. 3. If at the time of my death I am not survived by my wife, and have not prior to my death collected the insurance herein mentioned, and have not paid the devise herein mentioned to Mary Lena Cate, then it is my will that out of the proceeds of a life insurance in which my wife, Mildred Joyce Cate, is the beneficiary, which policy we both recognize as community property, there be paid as soon as same can be collected to the said Mary Lena Cate, of Cleveland, Tennessee, the sum of Ten Thousand Dollars ($10,000.00). The policy I refer to is the policy in the State Life Insurance Company. 4. I hereby appoint my wife, Mildred Joyce Cate, as Executrix of this will, if she survives me; otherwise I name, constitute and appoint my son, R. S. Cate. I direct that neither such Executrix, or contingent Executor, shall ever be required to give bond or security, and it is further my will that no action be had in the Probate Court in the administration of my estate other than to probate this will, and to return an inventory and appraisement and list of claims in favor of my estate. 5. It is further my will that my executrix, or contingent executor, in either instance or contingency, shall have full power and authority to sell, lease, assign, alienate and encumber, all or any part of my estate; and to execute and deliver Division Orders, Transfer Orders, and all other conveyances, transfers and releases, which either of them may deem necessary, with or without Warrant or Recourse; and to renew and extend any and all evidences of indebtedness, liens and encumbrances, whether same be in favor of, or a charge upon, my said estate; it being intended that such powers shall be in addition to, and their enumeration shall neither limit nor detract from, any and all specific powers, and general powers granted by law. 6. Should my wife not survive me, it is my will that my executor above named close up the affairs of my estate as promptly as in *her* judgment is for the best interest of *her* and my daughter, and distribute the estate in accordance with the terms of this will."

The evidence of Steed to his conclusion as to the agreement between H. C. and Mildred Joyce Cate, both deceased, at the time the will was being discussed by them in his office, is in direct conflict with the wills (which he drew), as executed by the testators.

The oral agreement he testified to, in legal effect gave to the survivor a life estate with power of sale, and a legal remainder in all property on hand on the death of the survivor to their children.

The wills as drawn and signed by appellees' parents gave to the survivor a fee simple title. The will of H. C. Cate (paragraph 2) gave all his estate to his wife, " * * * if she survives me; otherwise * * *" to appellees.

The will of Mildred Joyce Cate (paragraph 2) gave all her estate to her husband, " * * * if he survives me; otherwise * * *" to appellees.

The evidence of Steed as to his conclusion was objected to and exceptions to its admission were saved and error assigned thereto on this appeal.

Under this record that portion of the instrument which constitutes the will of H. C. Cate was separate and was disposed of in Cate v. Cate, Tex.Civ.App., 235 S.W. 2d 456, error refused. We now have before us, however, a different cause of action, to wit, one on an alleged oral contract; appellees claiming title to the property under such oral contract. The governing rules therefore are those applicable to contracts and not those applicable to wills.

The oral contract as alleged and testified to by Steed, is in direct conflict with the written wills and is clearly within the statute of frauds and therefore improperly admitted over objection. This

Court on appeal can only base its findings on competent admissible evidence and therefore cannot use as a basis for its findings of fact inadmissible evidence. Chalk v. Daggett, Tex.Com.App., 257 S.W. 228; Henry v. Phillips, 105 Tex. 459 (Syl. 7–8) 151 S.W. 533; Soell v. Haddon, 85 Tex. 182, 19 S.W. 1087.•

In Chalk v. Daggett, supra, the rule is correctly stated as follows [257 S.W. 230]:

"A parol contract to allow credits, entered into after the execution and delivery of a promissory note, would, in a suitable case, be admissible, Nalle v. Gates, 20 Tex. 315. On the other hand, such a contract entered into contemporaneously and, moreover, as here, providing for credits, not by payment of money but by means of balances to be ascertained by a collateral accounting as a condition precedent, cannot affect the obligation of the note, which because in writing, absorbs all relevant and basic oral negotiations or agreements occurring up to the time of its delivery and requires unconditional payment in dollars. Roundtree v. Gilroy, 57 Tex. 176; Bailey v. Rockwall County Nat. Bank, Tex.Civ.App., 61 S.W. 530; Standard Wagon Co. v. Roberts, Tex.Civ.App., 26 S.W. 246; 2 Elliott on Contracts, §§ 1626, 1628." [257 S.W. 230.]

■ The parties having reduced their contract to writing, as contained in the written wills, and, absent allegations of fraud, accident or mistake, it is presumed that the writing is the repository of and contains the whole of the agreement made between them. The exception to the rule applies only where a consistent portion of the total agreement is oral. Richardson v. Hart, 143 Tex. 392, 185 S.W.2d 563, opinion by Commission of Appeals, adopted by the Supreme Court; North v. Atlas Brick Co., Tex.Civ.App., 281 S.W. 608; Winkler v. Creekmore, Tex.Com.App., 256 S.W. 257 (Syl. 1); Smith v. Garrett, 29 Tex. 48.

■ There being no allegations by appellees of fraud, accident or mistake, or any relief of any kind to reform, modify, or otherwise change the written wills of the parties in the trial court pleadings, the written wills control.

■ Appellees cite Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472. The agreements of the several parties there are not inconsistent in any way with the written portion of the contract. It is therefore not in point here. Neither is Dallas Hotel Co. v. Lackey, 203 S.W.2d 557, in point. The rule that written portions of a contract control over printed portions is not involved here. Guadalupe, etc., v. City of San Antonio, 145 Tex. 611, 200 S.W.2d 989, also cited, does not hold the oral portions of the contract control over an inconsistent written agreement, but only reconciles the provisions of several agreements, all written.

The rule laid down in 10 Tex.Jur., secs. 166–8–9, p. 286, relates to the interpretation of an ambiguous contract or one of doubtful meaning. The written wills (the contract provisions thereof) are not ambiguous here.

17 Tex.Jur. 651–2, cited by the appellees, deals with written and oral contracts, and the considering of all together, " * * * provided they are not within the parol evidence rule;" therefore, is not in point here where the oral agreement is inconsistent with the written contract provisions of the will. R.C.S. Article 3713, Rule 21, is not in conflict with our holding here. The last sentence of such Rule reads: "A prior or contemporaneous parol agreement consistent with and forming a part of the contract is to be construed with the written part thereof".

Having reached the conclusion that the wills are plain and unambiguous, there was no question of fact for the jury, and therefore appellant's points 1 to 5, inclusive, should have been sustained. Such conclusion makes other points immaterial to our disposition of the appeal.

For the reasons stated, the judgment of the trial court is reversed and judgment is here rendered denying the appellees the relief prayed for by them in the trial court.

Reversed and rendered.