Charles MAGIDS, Petitioner,

v.

AMERICAN TITLE INSURANCE COMPANY, MIAMI, FLORIDA, et al., Respondents.

No. B–2467.

Supreme Court of Texas.

Nov. 10, 1971.

Rehearing Denied Dec. 8, 1971.

**462** ▉　▉▉▉▉▉▉▉▉▉▉▉▉

------◆------

Schlanger, Cook & Cohn, Joel W. Cook, Houston, for petitioner.

Butler, Binion, Rice, Cook & Knapp, Fletcher Etheridge, Houston, for respondents.

DANIEL, Justice.

The question presented here is whether an agreement between plaintiff, Charles Magids, and his wife, Fannie Magids, to execute identical wills devising to each other a life estate interest in all property "of which I die possessed", with the remainder to their three children, rendered the will of Charles Magids irrevocable and therefore effective upon the death of his wife, even though he is still living. It was so contended in the trial court by American Title anad Insurance Co., cross-plaintiff and holder of a lien on any interest of one of the Magids' sons, Barnett, in land known as the "Glendale property." American Title sought to foreclose its lien not only on the ⅙ remainder interest (⅓ of her ½) devised by the deceased Mrs. Magids to Barnett but also on an additional ⅙ remainder interest out of his father's ½ of the property which American Title claimed to be presently vested in Barnett under the alleged irrevocable will of his surviving father, Charles Magids.

The jury found that Mr. and Mrs. Magids "orally agreed, each in consideration of the other doing likewise, to execute wills providing each would leave his (her) property to the other for life" with the remainder to their three children and that each executed a will pursuant to such agreement. However, the jury failed to find that "Charles Magids, on or about the 13th day of February, 1964, made a contract with Fannie Nelkin Magids that he would not revoke" his will. That portion of the trial court's judgment involved in this appeal denied American Title's contention and rendered judgment for Charles Magids. The Court of Civil Appeals reversed and remanded. 459 S.W.2d 238. Except as hereinafter stated, we reverse the judgment of the Court of Civil Appeals and affirm the judgment of the trial court.

On February 23, 1964, Charles Magids and wife, Fannie Magids, executed the separate wills referred to above, and on June 28, 1964, before either will was revoked, Mrs. Magids died.[1] Mr. Magids probated her will, has since served as independent executor, and has accepted benefits from the life estate devised to him in the property of which his wife died possessed. After his wife's death, Magids discovered that their son, Barnett Magids, was claiming the Glendale property, along with various other properties not involved in this appeal under deeds to himself which bore the forged signatures of Mr. and Mrs. Magids. Barnett had executed a deed of trust on the Glendale property to secure a loan to him from Houston First Savings Associa-

------

1. The provisions under consideration here are set forth in Mrs. Magids' will as follows:

"If my husband survives me, I give, devise, and bequeath to my husband, Charles Magids, for and during his natural life, all the property, both real and personal and wherever situated, *of which I die possessed*, for his use and benefit during his natural life. Upon the death of my husband, the title to such property shall

vest in Barnett B. Magids, Samuel B. Magids, and Jack S. Magids, share and share alike."

\*　　\*　　\*　　\*　　\*

"It is my intention in this paragraph to create a life estate in all *my* property (both real and personal) for the benefit of my husband with the remainder to the three named beneficiaries or their issue." (Emphasis supplied.)

tion. Title to the lien was insured by American Title, which now holds all rights under the deed of trust by assignment from Houston First Savings Association. They and other respondents are referred to herein as "American Title." After discovering the forgeries by his son, Charles Magids executed a new will revoking his previous will of February 23, 1964. Acting individually and as independent executor of his wife's estate, Charles Magids filed this suit against his son, Barnett, American Title and numerous other persons and corporations, to remove the clouds cast by the forged deeds and the deed of trust on the Glendale and other properties owned by him and his deceased wife. American Title filed a cross-action seeking to foreclose its lien, claiming under the forged deed and the deed of trust on the Glendale tract, with an alternative plea for foreclosure on what it alleged to be Barnett's present vested ⅓ remainder interest in the property. Based upon jury findings as to the forgeries and the wills, the trial court rendered judgment in favor of Charles Magids, individually, for ½ interest in the fee title and a life estate interest in his wife's ½ interest in the properties.[2] As to the Glendale property, which is the only tract remaining subject to this appeal, the trial court found that Barnett holds a ⅙ undivided defeasible reaminder interest under the will of his mother, subject to the life estate of Charles Magids, and that this in-

terest was subject to the lien held by American Title under the covenants contained in the deed of trust signed by Barnett and under the doctrine of after-acquired title. Judgment of foreclosure was decreed on this ⅙ remainder interest, with the purchaser thereunder having the right of future possession only upon stated contingencies, from which there was no appeal.

American Title's plea that it also holds a lien subject to foreclosure on another ⅙ remainder interest out of Charles Magids' ½ of the property is based entirely upon its contention that the wills of Mr. and Mrs. Magids were contractual in nature; that after Mrs. Magids' death and the probate of and taking under her will by her husband, Mr. Magids' will could not be effectively revoked; and therefore his own ½ interest in the community property became converted into a life estate, with a ⅙ remainder interest (⅓ of his ½) vesting in his son, Barnett Magids.

The trial court disregarded the jury's findings in answer to Special Issues 1, 2 and 3, apparently concluding that such findings would not support a conclusion that the Magids had made an enforceable contract to devise all property then owned by them, or thereafter owned by them at the death of Mrs. Magids, in the manner set forth in each will. The Court of Civil Appeals disagreed, holding that the an-

2. The crucial issues and the jury's answers concerning the wills were as follows:

Special Issue No. 1: Do you find from a preponderance of the evidence that Charles Magids and Fannie Magids orally agreed, each in consideration of the other doing likewise, to execute wills providing that each would leave his (her) property to the other for life with the remainder as provided in Fannie Magids' will, Plaintiff's Exhibit 7?
To which the jury answered: "We do"
Special Issue No. 2: Do you find from a preponderance of the evidence that Fannie Magids executed said will pursuant to such agreement, if any you have found?

To which the jury answered: "We do"
Special Issue No. 3: Do you find from a preponderance of the evidence that Charles Magids executed his will pursuant to such agreement, if any you have found?
To which the jury answered: "We do"
Special Issue No. 11: Do you find from a preponderance of the evidence that the Plaintiff, Charles Magids, on or about the 13th day of February, 1964, made a contract with Fannie Nelkin Magids that he would not revoke the will inquired about in Special Issue No. 1?
To which the jury answered: "We do not"

swers to these issues "established a contract which was irrevocable after the death of Mrs. Magids unless the agreement provided otherwise." However, the Court of Civil Appeals remanded the case because (1) the trial court did not admit the evidence of another son, Jack Magids, that he heard discussions of the wills between his parents in which his father said to his mother "You can change your will at any time and I can change my will at any time," and (2) the question of whether there was included in the agreement to make the wills a right of revocation was not properly submitted to the jury.

In reversing the trial court on this phase of the case, the Court of Civil Appeals did not properly apply basic rules which relate to the question of whether reciprocal wills are mutual and irrevocable.[3] To begin with, the prevailing rule is that wills, as distinguished from binding contracts, are revocable. By their very nature, wills dispose of property at the time of death, and not before; until then, they are ambulatory in the sense that they may be changed or revoked as long as the living testators are *sui juris*; and this has been held to be true even with respect to mutual wills made pursuant to binding contracts for disposition of property in a certain manner. Tips v. Yancey, 431 S.W.2d 763 (Tex.Sup.1968); Murphy v. Slaton, 154 Tex. 35, 273 S.W.2d 588 (1954); Wyche v. Clapp, 43 Tex. 543 (1875); Bailey, Wills, 10 Texas Practice, § 470, 197–200. These and other Texas authorities make a clear distinction between the wills themselves and any underlying irrevocable contracts to dispose of property at death. If the same document contains both the will and the contract, "it is the contractual portion of the will and not the will itself which is irrevocable." Kirk v. Beard, 162 Tex. 144, 345 S.W.2d 267, 272 (1961);

The Joint and Mutual Will, XVI Baylor L. R. 167 (1964); Sparks, Contracts to Make Wills (N.Y.Univ.Press, 1956), 5–6, 20–21, 111–123; I Page on Wills (Third Lifetime Edition) 158–160, 228.

Entirely distinct from the rule applicable to wills or the testamentary portion thereof, there may be binding contracts to make testamentary disposition of certain property effective at the death of one of the contracting parties which become irrevocable after his death and therefore may be enforced although the survivor's will made pursuant thereto has been changed or revoked. Tips v. Yancey, supra. Thus, it is legally possible for a husband and wife, if they so desire, to enter into a contract for disposition to their children of the remainder interest in community property owned by them at the death of the first to die. If they so contract, and the wills made pursuant thereto remain in effect at the death of one of them, the result is to place the survivor's ½ fee ownership beyond his power to otherwise effectively dispose of the remainder interest by deed or will. Weidner v. Crowther, 157 Tex. 240, 301 S.W.2d 621 (1957); Murphy v. Slaton, supra; Chadwick v. Bristow, 146 Tex. 481, 208 S.W.2d 888 (1948); Nye v. Bradford, 144 Tex. 618, 193 S.W.2d 165 (1946). However, contracts of this nature are reviewed by the courts with caution; they can be established only by full and satisfactory proof; and no presumptions or inferences will be indulged in favor of them. Kirk v. Beard, supra, 345 S.W.2d at 272; Sparks, Contracts to Make Wills, supra, 24–38. "In many cases the courts have declared that contracts to dispose of property in a particular way by will, if oral, are looked upon with suspicion, and are only sustained when established by clear, satisfactory, and convincing evidence." Rollinson, Wills, 340 (1939).

3. As used in this opinion, the term "reciprocal wills" means those in which each testator names the other as the beneficiary without any inference of mutuality or binding contract. Likewise limited to its use in this opinion, the term "mutual wills" refers to wills executed pursuant to an enforceable contract between two testators to dispose of certain property at death in a particular manner.

Perhaps a better rule would be to require such agreements to be expressed in writing, but in the absence of that requirement, the courts have supplied safeguards through strict application of rules relating to burden of proof and against inferences and presumptions in favor of such oral contracts.

■ It has long been held that the burden of establishing such a contract is upon the party asserting its existence. Nye v. Bradford, supra; Kirk v. Beard, supra; Kastrin v. Janke, 432 S.W.2d 539 (Tex. Civ.App.1968, writ ref. n. r. e.). Also, as held in the latter case, in order to prevail, the party asserting a binding contract must prove more than a mere agreement to make reciprocal wills. The *Kastrin* case involved wills of a husband and wife similar to those in the present case. In holding that there was no evidence to support the trial court's judgment that the wills were based upon a mutual and irrevocable contract, the court said:

"There are many articles speaking on this point, but we will not burden the record with all of them, but believe the matter is well summed up by the statement in 97 C.J.S. Wills § 1367, at page 299. In that text it is pointed out that the agreement must be definite, defined or certain in all its parts, and clear, both in its terms and as to the subject matter. This text goes on to point out further that the agreement, in order to make the wills mutual and enforceable, must be more than a mere agreement to make wills. It must involve the assumption of an obligation to dispose of the property as therein provided, or not to revoke such wills, which are to remain in force at the death of the testators. Again we must point out from the evidence herein that there seems to be nothing more than an agreement, after many bitter discussions between Papa and Mama Janke, that they would make wills. Such wills were made, read to them and properly attested. There is no evidence of any

consideration or irrevocability." 432 S. W.2d at 541–542.

■ Applying the foregoing rules to this case, we hold that the trial court was correct in disregarding the jury's answers to Special Issues 1, 2 and 3, and that the Court of Civil Appeals erred in holding that such answers "established a contract which was irrevocable after the death of Mrs. Magids *unless the agreement provided otherwise*." The latter phrase, to which we have supplied emphasis, erroneously places the burden on Charles Magids to show that the alleged contract provided for revocability. American Title, the party asserting that a binding contract existed between Mr. and Mrs. Magids which would prevent him from changing or revoking his will after her death, had the burden of proving facts and obtaining a jury finding which would support that conclusion. This it failed to do. There is a vast difference between an agreement between husband and wife to execute reciprocal wills on February 23, devising to each other all property "of which I die possessed," and an agreement to dispose of all their community property in that same manner at the time of their deaths. Special Issue No. 1 inquires only whether the Magids orally agreed "to execute wills" with certain provisions. The affirmative answer is no more than a finding that there was an agreement to execute instruments that, in law, each party would be free to change or revoke at any time. The agreement found by the jury was fully performed when the wills were executed. Under American Title's theory of the case, the crucial question is whether the Magids made an oral agreement to dispose of their community property at their respective deaths, or at the death of the first of them, in the manner set forth in the wills, and this was not asked. The failure is understandable, because there was no evidence of this type of underlying contract between Mr. and Mrs. Magids.

In so holding, we look first to the wills themselves and then to the extrinsic evi-

dence. Although the wills were on an identical form prepared by the same scrivener and signed at the same time before the same witnesses, they were entirely separate wills dealing only with each testator's property "of which I die possessed." Neither refers to the other or contains any mention of any agreement or contract. Neither refers to the disposition of any certain or specific property, only that "of which I die possessed." Each will contains an intent clause explaining that it creates a life estate "in all *my* property", with the remainder to the three children. Neither will attempts to deal with the entire community estate of both testators in a manner that would affect the survivor's ½ interest or put the survivor to an election whether to take under the will. Graser v. Graser, 147 Tex. 404, 215 S.W.2d 867 (1949); Ray, The Widow's Election, 15 Southwestern L.J. 85, 89–92. On the contrary, their terms are those usually employed by husband and wife in making separate reciprocal wills when no intention exists to devise or involve more than each testator's ½ of the community estate. Therefore, standing alone, the Magids' wills do not by their terms constitute any binding contract between the parties which would render the survivor's will in effect irrevocable upon the death of his spouse. This was the holding with reference to similar wills of a husband and wife in Wagnon v. Wagnon, 16 S.W.2d 366 (Tex. Civ.App.1929, writ ref.), and it accords with the decisions in other jurisdictions. See cases noted in Sparks, Contracts to Make Wills, supra, 29–31.

█ Both joint and separate reciprocal wills containing similar terms have been held to have had no effect on the survivor's ½ of the community, leaving him free to sell or deal with it as he pleases. Aniol v. Aniol, 127 Tex. 576, 94 S.W.2d 425 (1936); Wyche v. Clapp, 43 Tex. 543 (1875); McClure v. Bailey, 209 S.W.2d 671 (Tex. Civ.App.1948, writ ref. n. r. e.). The same has been held with respect to mutual wills and irrevocable contracts which had similar terms as to property affected and time of disposition. Hamilton v. Hamilton, 154 Tex. 511, 280 S.W.2d 588 (1955); Richardson v. Lingo, 274 S.W.2d 883 (Tex.Civ.App.1955, writ ref. n. r. e.); Wallace v. Peoples, 89 S.W.2d 1030 (Tex. Civ.App.1936, writ dism.); McFarland v. Campbell, 213 F.2d 855 (5th Cir. 1954). Thus, even if Mr. Magids had contracted not to revoke his will, the result as to his own ½ of the property would be the same, because under the terms of the wills neither spouse was undertaking, attempting, or professing to dispose of the other's property; Mr. Magids' will would have been effective only upon his death, and then only as to that property of which he died possessed. There is dictum in Wagnon v. Wagnon, supra, to the effect that separate reciprocal wills devising to each spouse "all the residue of *my* estate" for life, with the remainder to their children, may, upon proof of an oral contract that they were mutual, be interpreted as applying to the entire community estate of both parties.[4] To the extent of conflict with this opinion, such dictum is disapproved.

█ It has been held that the similarity of reciprocal wills and their execution by husband and wife at the same time and place and before the same witnesses may be considered along with other evidence in determining whether they were executed pursuant to an agreement to make joint disposition of their property, if the provisions of the wills are consistent with such

---

4. Compare Chadwick v. Bristow, 146 Tex. 481, 208 S.W.2d 888 (1948), wherein the holding in *Wagnon* is incorrectly stated, and in which the facts were quite different from *Wagnon*. In *Chadwick*, the joint will covered "all property whether separate estate of either of us or our community estate," and this Court said: "Obviously, the testators had jointly, mutually, and reciprocally contracted with each other that '*all the property of both*' should go the the survivor for life, with the remainders as stated." See also Martinez v. Pearson, supra, and The Joint and Mutual Will, XVI Baylor L.R. 167, 176–178 (1964).

theory. Pullen v. Russ, 226 S.W.2d 876 (Tex.Civ.App.1950, writ ref. n. r. e.). Here, the terms of the wills are not consistent with the theory advanced by American Title that they were contracted to be a devise of all interest in the community property owned by testators at the death of Mrs. Magids. If the Statute of Frauds had been invoked, terms of an oral contract at variance with or in addition to those incorporated into the wills made pursuant thereto would have been inadmissible and unenforceable.[5] In any event, since neither of the Magids' wills contains terms dealing with the entire community estate in a manner that would transmute the survivor's $\frac{1}{2}$ interest into a life estate upon the death of his spouse, the wills themselves negate rather than tend to prove any agreement that they were to have such effect.

Neither do we find any extrinsic evidence of such a contract in this record. As stated by the Court of Civil Appeals, "The answers to the issues finding that the wills were executed pursuant to an agreement rest almost exclusively on Charles Magids' deposition testimony to the effect that he 'agreed' with his wife to make identical wills." [6] That in itself sums up the limited extent of the jury's finding and the lack of evidence that these wills were based on any underlying contract that they would be mutual and in effect irrevocable. The only testimony admitted on the issue of revocability was Mr. Magids' insistent and repeated testimony that he and his wife discussed whether after the death of one of them the other would be free to change his or her will and that both understood and agreed that the survivor would be free to do so. In answer to Special Issue No. 11, the jury failed to find that "Charles Magids on or about the 13th day of February, 1964, made a contract with Fannie Nelkin Magids that he would not revoke the will inquired about in Special Issue No. 1." This issue was requested by Mr. Magids, and American Title objected to its submission on three grounds: (1) that there is no evidence and (2) that there is insufficient evidence to support an affirmative answer to the issue and (3) that an affirmative answer would be against the great weight and preponderance of the evidence. Upon motion to disregard the jury's finding and upon this appeal American Title adds additional objections relating to the date inquired about ("on or about the 13th day of February, 1964," which was ten days prior to the date the wills were executed) and the materiality of the finding. It is unnecessary for us to pass on these questions, except to reiterate that the burden was not on Mr. Magids to prove or obtain a finding that any agreement relating to these wills provided that the survivor could change or revoke his or her will. On the contrary, as heretofore stated, under American Title's theory of the case, the burden was upon it to prove and obtain a finding that the

5. Upson v. Fitzgerald, 129 Tex. 211, 103 S.W.2d 147; Haynes v. Henderson, 345 S.W.2d 857 (Tex.Civ.App.1961, writ ref. n. r. e.); Martinez v. Pearson, 373 S.W.2d 76 (Tex.Civ.App.1963, no writ hist.); Cate v. Cate, 249 S.W.2d 73 (Tex.Civ.App.1952, no writ hist.). See also Meyer v. Texas National Bank of Commerce, 424 S.W.2d 417 (Tex.Sup.1968).

6. Professor E. W. Bailey says: "Warnings have been sounded that evidence tending to show that the parties 'agreed' to the making of such wills should not be taken as establishing or tending to establish, the existence of an intent to contract." 10 Texas Practice, Wills #451, p. 150; Bailey, Contracts to Make Wills—Proof of Intent to Contract, 40 Tex.L.R. 941, 954 (1962). For other comments on this and related problems resulting from what Professor Bailey calls "the attempt to nurture such a resistant and unyielding plant as a binding contract in the unstable and dissolving soil of the revocable and ambulatory testamentary disposition" (id. 941), see The Contractual Will: Invitation to Litigation and Excess Taxation, 48 Tex.L.R. 909 (1970); Sparks, Operation of Joint Wills in Texas, 31 Tex.Bar Journal 277 (1968); The Joint and Mutual Will, XVI Baylor L.R. 167 (1964); and The Doctrinal Relationships of Concerted Wills and Contracts, 29 Tex.L.R. 439 (1951).

Magids made a contract to dispose of the community property owned by both of them at the time of the death of the first of them, and that the wills were made pursuant to such contract. This it failed to do.

 On another phase of the case, a question remains as to whether Mr. Magids, as independent executor of his wife's estate, has the right to sell his wife's ½ of the Glendale property for the purpose of paying taxes and debts owed by her estate. Her will provided: "My Executor is hereby authorized to sell, dispose of, deliver, and convey any portion of my estate, real or personal at public or private sale, for any price, and on such terms as he shall deem advisable, for the purpose of paying taxes, debts, or expenses of administration." Mr. Magids alleged that he had the right to make such sale, including Barnett Magids' remainder interest, free and clear of American Title's deed of trust lien, for the purpose of paying claims against his wife's estate and collecting a debt owed to the estate by Barnett Magids. American Title contended, and sought a declaratory judgment, that Charles Magids had no such rights as independent executor and that he should be required to exhaust other assets of the estate before selling Mrs. Magids' ½ interest in the Glendale property. The trial court ruled that it had no jurisdiction to decide these issues. The Court of Civil Appeals held that, since the controversy involves construction of the will of Mrs. Magids as well as the doctrine of marshaling assets in the hands of the independent executor, the trial court had jurisdiction to determine these matters under the plea for declaratory relief. We agree with the judgment of the Court of Civil Appeals on this point. Griggs v. Brewster, 122 Tex. 588, 62 S.W.2d 980 (1933); Pinkston v. Pinkston, 254 S.W.2d 196 (Tex.Civ.App.1953, writ ref. n. r. e.). We affirm that portion of the judgment of the Court of Civil Appeals reversing and remanding the trial court's judgment with reference to American Title's plea for a

declaratory judgment, and that portion of this case is severed for trial on the issues therein presented.

Finally, Charles Magids urges that the trial court erred in assessing against him, individually and as independent executor, one-half of the fees allowed to the attorneys and guardians ad litem appointed to represent the minors interpleaded as cross-defendants by American Title. This point was not briefed by the parties in this Court. We have examined the judgment and such pleadings as were brought forward in the transcript and find no reason to hold that the trial court abused its discretion in prorating these costs. Rules 131 and 141, Texas Rules of Civil Procedure.

Accordingly, except as noted above, the judgment of the Court of Civil Appeals is reversed and the judgment of the trial court is affirmed. Costs in this Court are adjudged against respondents.