In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-02-00167-CV


______________________________







IN THE ESTATE OF MARIE NOVELENE OSBORNE, DECEASED








 


On Appeal from the County Court at Law


Gregg County, Texas


Trial Court No. 2002-0139-P




 




Before Morriss, C.J., Ross and Carter, JJ.


Opinion by Chief Justice Morriss


Dissenting Opinion by Justice Carter


O P I N I O N



 After a hearing, the trial court granted a summary judgment in favor of Larry and Jerry
Osborne and placed the real and personal property of Orlando and Marie Osborne's estate in
constructive trust for their benefit. On appeal, Deleese Agee Blackmon and Carolyn Agee Robertson
contend the trial court erred by finding the April 12, 1978, last will and testament of Orlando and
Marie to be contractual.

 On April 12, 1978, Orlando and Marie Osborne executed a joint will ("Joint Will"). (1) 
According to the Joint Will, initially the survivor, and ultimately four individuals identified as "our
children" (or their descendants), would receive the property of the combined estate. "Our children"
is defined in the Joint Will as Deleese Agee Weedon, Carolyn Agee Robertson, Jerry N. Osborne,
and Larry M. Osborne. On March 21, 1981, however, Marie executed a holographic will without
Orlando's knowledge or consent, giving her entire estate to her daughters, Deleese and Carolyn. 

 On August 30, 1996, Orlando died, and Marie subsequently offered the Joint Will for
probate as a muniment of title. On April 3, 2002, Marie passed away, and Deleese and Carolyn filed
an application to probate the holographic will and sought issuance of letters testamentary. Jerry and
Larry filed an opposition to the application and sought to enforce the Joint Will. Deleese and
Carolyn filed a motion for summary judgment, contending Marie was not contractually bound by
the terms of the Joint Will. Jerry and Larry responded by filing their own motion for summary
judgment, arguing the Joint Will constituted a contract and they were entitled to equal shares of
Marie's estate. After a hearing, the trial court granted Jerry and Larry's motion for summary
judgment and imposed a constructive trust on Marie's estate in their favor. Deleese and Carolyn
bring this appeal.

 In their only point of error, Deleese and Carolyn contend the Joint Will was not contractual,
because it failed to provide for a plan of disposition on the death of the survivor. A joint will
becomes contractual when it is executed pursuant to an agreement between the testators to dispose
of their property in a particular manner, each in consideration of the other. Nye v. Bradford, 144
Tex. 618, 193 S.W.2d 165, 168 (1946); Ellexson v. Ellexson, 467 S.W.2d 515, 519 (Tex. Civ.
App.-Amarillo 1971, no writ). The party who asserts the will is contractual has the burden of
establishing that fact. Nye, 193 S.W.2d at 167. The contract may be established by the provisions
of the will itself, or the will and extrinsic evidence may be combined to satisfy the burden. Id. at
168; Fisher v. Capp, 597 S.W.2d 393, 398 (Tex. Civ. App.-Amarillo 1980, writ ref'd n.r.e.). 
Because no extrinsic evidence was presented, we must determine the contractual nature of the Joint
Will based solely on the language contained within the four corners of the document. 

 In order to determine if a joint will is contractual, the primary factor to consider is whether
the will, as a whole, sets forth "a comprehensive plan for disposing of the whole estate of either or
both" of the testators. Novak v. Stevens, 596 S.W.2d 848, 852 (Tex. 1980); Murphy v. Slaton, 154 
Tex. 35, 273 S.W.2d 588, 593 (1954). (2) Courts have consistently found the existence of a
comprehensive plan of disposition when (1) the joint will treats the property of both testators as one
estate and (2) provides for a disposition of the estate property both at the time of the first testator's
death and a disposition of the remainder of the estate on the death of the survivor. It has been
established that such a disposition indicates the testators intended to carry out a planned and
complete disposition of all their property, regardless of who died first. Harrell v. Hickman, 147 Tex.
396, 215 S.W.2d 876, 878 (1948); Nye, 193 S.W.2d at 168; Fisher, 597 S.W.2d at 398-99. 

 In the present case, the Joint Will treats the property of both Orlando and Marie as one estate. 
For example, the following excerpts from the will consistently use pronouns such as "our," "we," and
"us": 

 We, Orlando N. Osborne and Marie N. Osborne, husband and wife, of Harris County,
Texas, being of sound mind and disposing mind . . . and for the purpose of making
the best disposition of our worldly affairs, do hereby make, and publish this our Last
Will and Testament. 

 . . . .


 It is our will that the survivor of us, Orlando N. Osborne or Marie N. Osborne, shall
with the right and authority below given, have for life all real property of our estate. 

 . . . .


 We give, devise and bequeath all the rest, residue and remainder of all our property
and estate of every kind, character and description, and wherever situated, together
with all property over which we may have power or testamentary disposition at the
time of our death, pursuant to power of appointment or otherwise, and which we have
not disposed of by the foregoing provisions hereof, in equal shares to our children. 
 

(Emphasis added.) See Knolle v. Hunt, 551 S.W.2d 755, 760 (Tex. Civ. App.-Tyler 1977, writ ref'd
n.r.e.). The extensive and uniform use of the plural pronouns "we," "us," and "our" evidences a clear
intention of both testators to treat their property as one estate. See Nye, 193 S.W.2d at 168. Further,
the above excerpts present clear proof that both Orlando and Marie intended to make a final
disposition of their estate on the death of the survivor by bequeathing all remaining property "at the
time of our death" in equal shares to their children. See id.; In re Estate of Johnson, 781 S.W.2d
390, 392-93 (Tex. App.-Houston [1st Dist.] 1989, writ denied); Trlica v. Bunch, 642 S.W.2d 540,
543 (Tex. App.-Dallas 1982, no writ). 

 Further analyzing the various provisions in the Osbornes' will is helpful in confirming the
will demonstrates a "comprehensive plan to dispose of all property" of both testators and thus makes
it contractual.

 In the preamble, the Osbornes stated their will's purpose as "making the best disposition of
[their] worldly affairs," that is, disposing of their property. We can find in that stated purpose no
reservation that any property would not be disposed of by this will. In fact, the residuary clause in
paragraph IV explicitly disposes of all other property not otherwise disposed of in other provisions
of the will. It is clear the Osbornes intended to dispose of all their property, that is, all of the
property that either or both of them owned at their death. This supports a finding that the Osbornes
intended a comprehensive plan to dispose of all their property.

 In paragraph II, the will distributes the real and personal property by separate methods. First,
the survivor is given a life estate in "all real property of [their] estate." There is no explicit provision
in this paragraph distributing the remainder, so the remainder goes to the four children or their lineal
descendants, as set out by the residuary clause of paragraph IV. We note that the life estate in all real
property given to the survivor, with the remainder distributed by the residuary clause to the four
children, includes the real property interests of both testators and thus clearly and completely
disposes of all real property in any and all circumstances. Second, the survivor is given "all of [the
testators'] personal property," but if the survivor remarries, then one half of that personal property
shall be divided by the four children or their lineal descendants. Since this gift applies to all personal
property, the half thereof that is redirected on remarriage of the survivor would essentially be the half
belonging to the deceased testator, leaving the survivor with only his or her personal property. The
devise of personal property gives the survivor power over his or her personal property during his or
her lifetime, but that is not inconsistent with the concept of a comprehensive plan. This, too, is
consistent with a finding of a comprehensive plan to dispose of all property.

 Paragraph III provides that, in the event of a common disaster or simultaneous death, or death
of both testators within a week of each other, the four children or their descendants would share in
all property of the estates. While this, viewed alone, is not necessarily probative of a comprehensive
plan, it is certainly consistent with one.

 Paragraph IV is the "residuary clause," distributing anything else "which [the testators] have
not disposed of by the foregoing provisions" to the four children. This supports a finding of a
comprehensive plan to dispose of all property.

 In paragraphs II and III, but not in paragraph IV, essentially the same formulation is set out
identifying the four children to ultimately take in equal shares and providing for succession if one
or more of those four children predeceased the survivor. The provisions of paragraphs II and III
reference the children's "lineal descendants," explaining that, if any of the four children predecease
the testators, "such children of theirs [shall] take per stirpes" the share otherwise going to their
predeceased parent. While it is curious that the residuary provision in paragraph IV does not contain
this same contingent disposition, that does not undermine a finding of a comprehensive plan to
dispose of all property, especially here, where all four children survived both testators.

 Did these two testators believe when they executed this will they were setting forth a
comprehensive plan disposing of all of their property? Regardless of their intent, did they do so? 
Based on the language in this will, we conclude they intended to and did. (3)
 Therefore, Marie was
contractually bound by the Joint Will to dispose of her estate in accordance with its terms. 

 A joint will that was also made contractual can be revoked by a subsequent will to the extent
the subsequent will does not contradict the terms of the contract. Novak, 596 S.W.2d at 853; Estate
of Johnson, 781 S.W.2d at 394. Accordingly, a subsequent will can be admitted to probate, but if
it seeks to circumvent the terms of the contractual will, the proper remedy is to impose a constructive
trust on the estate in order to enforce the contract. Novak, 596 S.W.2d at 853. Therefore, in the
present case, the trial court properly admitted Marie's holographic will to probate. Because the
holographic will contradicted the Joint Will, the trial court properly imposed a constructive trust on
the estate in favor of Larry and Jerry.

 For the reasons stated, we affirm the trial court's judgment. 


 Josh R. Morriss, III

 Chief Justice



DISSENTING OPINION


 I do not believe that the evidence establishes that the will in question is a contractual will.

 The majority states that a contractual will exists when the court finds the existence of a
comprehensive  plan  of  disposition  that  (1)  treats  the  property  of  both  testators  as  one  estate;
and (2) provides for a disposition of the estate property both at the time of the first testator's death
and a disposition of the remainder of the estate on the death of the survivor. I do not believe that this
will meets the second prong of the test by evidencing a disposition of the property on the death of
the survivor.

 One who relies on a will as a contract has the burden of proving that the will is contractual
and that it came about as a result of a mutual agreement by both parties. Nye v. Bradford, 144 Tex.
618, 193 S.W.2d 165, 167 (1946). However, wills which purport to be contractual "are reviewed
by the courts with caution; they can be established only by full and satisfactory proof; and no
presumptions or inferences will be indulged in favor of them." Magids v. Am. Title Ins. Co., 473
S.W.2d 460, 464 (Tex. 1971); Bishop v. Scoggins, 589 S.W.2d 151, 154 (Tex. Civ. App.-Tyler
1979, writ ref'd n.r.e.). The use of words such as "we," "us," and "ours" alone does not establish the
contract to make a will, nor does execution of the will simultaneously before the same witnesses
establish such a contract. Morris v. Tex. Elks Crippled Children's Hosp., Inc., 525 S.W.2d 874, 876
(Tex. Civ. App.-El Paso 1975, writ ref'd n.r.e.).

 The language of this will clearly devises to the survivor a life estate of all real property
owned by the parties. However, the common thread that is present in the cases that are found to be
contractual is not present in this case. Specifically, there is no provision in this will providing
disposition of property "upon the death of the survivor" or words to that effect. Each of the cases
cited by the majority in its opinion have such language. See Novak v. Stevens, 596 S.W.2d 848, 851
(Tex. 1980) ("upon the death of such survivor"); Murphy v. Slaton, 154 Tex. 35, 273 S.W.2d 588,
590 (1954) ("upon the death of such survivor"); Harrell v. Hickman, 147 Tex. 396, 215 S.W.2d 876,
877 (1948) ("[a]fter the death of both of us"); Nye v. Bradford, 144 Tex. 618, 193 S.W.2d 165, 166
(1946) ("upon the termination of the life estate of the survivor of us"); In re Estate of Johnson, 781
S.W.2d 390, 391 (Tex. App.-Houston [1st Dist.] 1989, writ denied) ("upon the surviving testator's
death"); Trlica v. Bunch, 642 S.W.2d 540, 542 (Tex. App.-Dallas 1982, no writ) ("or after the death
of both of us"); Fisher v. Capp, 597 S.W.2d 393, 395 (Tex. Civ. App.-Amarillo 1980, writ ref'd
n.r.e.) ("when the last survivor of this union shall have been claimed by death"); Knolle v. Hunt, 551
S.W.2d 755, 758 (Tex. Civ. App.-Tyler 1977, writ ref'd n.r.e.) ("at the death of the survivor of us").

 A similar clause is not present in this will. The residuary clause does not contain a further
disposition of property at the death of the survivor. This Joint Will expresses that the remainder of
"our property" is devised in equal shares to our children "at the time of our death."

 That clause expresses the intention of each party to make such a disposition of the residue
of his or her property, but it does not bind the parties contractually. A secondary disposition after
the death of the last survivor is simply not present. The first testator to die has not exercised control
over his or her property and "the property . . . of the survivor." Fisher, 597 S.W.2d at 399 (emphasis
added).

 Without the disposition after the death of the survivor or any extrinsic evidence, I believe that
the evidence does not establish a contractual will, and I therefore respectfully dissent.


 Jack Carter

 Justice


Date Submitted: May 14, 2003

Date Decided: June 13, 2003
1. A joint and mutual will must be the will of two or more persons contained in a single
testamentary instrument, jointly executed by them pursuant to an agreement to dispose of their
respective estates to each other or to third parties. In re Estate of Johnson, 781 S.W.2d 390, 392
(Tex. App.-Houston [1st Dist.] 1989, writ denied). It is undisputed that the Joint Will constitutes
a joint will.
2. Section 59A of the Texas Probate Code requires that wills drafted after September 1, 1979,
can only be contractual if the language of the will expressly provides such. Tex. Prob. Code Ann.
§ 59A (Vernon 2003). Because the will in question was drafted before 1979, that section is
inapplicable. 
3. The dissent concludes that because the Osbornes' joint will did not contain an explicit phrase
such as "on the death of the survivor," the joint will was not contractual. The Texas Supreme Court
in Novack v. Stevens, 596 S.W.2d 848, 852-53 (Tex. 1980), in deciding that joint will was
contractual, read the will as a whole and did not focus on the presence of any particular phrase
containing the word "survivor," but determined that the will "was executed to effect a planned
disposition of 'all the estate of every description, real, personal, or mixed which either or both of us
may own at our death.'" Id. at 852. That same court, in Weimers v. Weimers, 683 S.W.2d 355, 356
(Tex. 1984), focused on "George and Ida's joint will and desire to distribute 'the whole of our real
estate,'" not the presence of the phrase "upon the death of the survivor." Finally, in the latest word
from the Texas Supreme Court on the subject, Odeneal v. Van Horn, 678 S.W.2d 941 (Tex. 1984),
found another joint will contractual. Admittedly, the Van Horn will also had language about "upon
the death of the survivor," but, again the court seemed less concerned about that phrase than about
other language indicative of the overall intent of the testators. The court stated as follows:


 A joint will is contractual if it is executed by both parties and sets forth a
comprehensive plan to dispose of all the property of both parties. Novak v. Stevens,
596 S.W.2d 848 (Tex. 1980). The Van Horn will sets forth a plan to dispose of "all
property, real, personal and mixed, both community and separate."


 This language is sufficient to show on its fact that Parkes and Virginia Van
Horn executed their joint will pursuant to an agreement as to the distribution of their
property.


Id. at 942 (Emphasis added.) Though the Osbornes did not use the phrase desired by the dissent, the
words they chose had the same effect of disposing of all their property on the death of the survivor. 
We believe that is sufficient under the standard set out by the Texas Supreme Court to render their
joint will contractual.





">A. Because of the incident that had happened, and - -
Q. Well, let me just – what did you tell him?
A. I told him to leave because my sister-in-law said leave and don't come back.
[Counsel]:Objection, Your Honor, hearsay.
[Witness]:Well, she told me that.
The Court:Well, he can testify as to what he said. Go ahead.
Q.What did you tell Sherman Martin when he got out of the car?
            A.        I told him to leave because my sister-in-law told him to leave because he had messed
up, because he had killed somebody or something.
 
            Q.       Did you use the words, "You'd killed somebody"?
            A.       I remember saying it one or two times.
(Emphasis added.)
            To preserve error for appellate review, there must have been a timely request, objection, or
motion to the trial court, and a ruling by the trial court. Tex. R. App. P. 33.1(a)(1), (2); Tucker v.
State, 990 S.W.2d 261, 262 (Tex. Crim. App. 1999). An objection must be made every time
inadmissible evidence is offered. Tex. R. App. P. 33.1; Ethington v. State, 819 S.W.2d 854, 858
(Tex. Crim. App. 1991); Long v. State, 10 S.W.3d 389, 399 (Tex. App.—Texarkana 2000, pet. ref'd). 
An alternative is to get the trial court's approval for a continuing objection. Sattiewhite v. State, 786
S.W.2d 271, 283 n.4 (Tex. Crim. App. 1989).
            Ultimately—probably because the trial court had overruled two prior objections to questions
concerning why Gerald told Martin to leave—the embedded hearsay contained in Gerald's
subsequent testimony was not objected to; therefore, error in its admission was not preserved. There
are two factors contributing to our conclusion that error was not preserved: first, counsel did not
object each time the evidence was offered, as is required; and, second, the objections were, in the
trial court's thinking, directed at only Gerald 's quotes of his own words, not his sister-in-law's words. 
When the hearsay objections were made, the trial court clearly believed counsel's concern was just
about what Gerald said. At no time did counsel point out to the trial court that the real concern was
over the sister-in-law's embedded hearsay statement that Martin "killed somebody." The admitted
evidence quoted specific claims of the sister-in-law and therefore was different in nature from, "what
[Gerald] said," the only thing discussed when the objections were made earlier. Because there was
no objection at that time, the trial court was not given the chance to rule on the admissibility of the
embedded hearsay. Thus, error was not preserved.
3. It was Error to Admit Jacquelyn Templeton's Hearsay Warning that Simpson's Going with Martin
would be His "Worst Mistake"

            Martin complains of testimony by Jacquelyn Templeton in which she recounted her part of
a conversation she had with Simpson and Martin shortly before the shooting, during which she told
Simpson—in Martin's presence and after Martin asked Simpson for a ride—that "it was going to be
the worst mistake he ever made, not [sic] to be fooling with [Martin] at that time. I told him not to
take [Martin] in his truck, but he did anyway." Counsel objected based on hearsay. Hearsay is
defined as a statement, other than one made by the declarant while testifying at the trial, offered in
evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d).
            The State argues on appeal that this is not hearsay because the recounted statement is not one
offered for the factual content, but for the declarant's belief or opinion about her suspicions. We
disagree. The same contention was rejected by this Court earlier this year:
Such reasoning, if approved, would make any opinion admissible, even though the
facts on which such opinion is based are inadmissible, without recourse to the
hearsay objection. This is not consistent with the rule. "Matter asserted" includes
any matter explicitly asserted, and any matter implied by a statement, if the probative
value of the statement as offered flows from the declarant's belief as to the matter. 
Tex. R. Evid. 801(c). Hearsay evidence is not admissible. See Tex. R. Evid. 802. 
The matter asserted in this case was the opinion. It was hearsay and inadmissible.
May v. State, No. 06-03-00168-CR, 2004 WL 1403168, at *8 (Tex. App.—Texarkana June 24, 2004,
pet. ref'd). Likewise, this testimony by Jacquelyn was hearsay.
            We note, however, that the information was already at least partially in the record. The
record reveals that testimony somewhat to the same effect—though less powerful—was previously
admitted through the same witness:
Q.All right. On - - about 12:00 o'clock, what happened?
 
A.He [Martin] came to the door and knocked, and I saw a truck outside, and it
was Bobby [Simpson]. And I asked him [Martin] what he wanted, and he said he
was looking for Ken. And I went and talked to Bobby, and I was trying to tell
Bobby that he didn't need to hang with Sherman, but - - 

(Emphasis added.) This testimony was not objected to and is in the same vein as the objected-to
testimony. Although it is not as readily recognizable as hearsay, and certainly not as dramatically
phrased as the objected-to testimony, nonetheless this hearsay, too, recounts a warning from
Jacquelyn that Simpson not spend time with Martin that night. So, we conclude that the fact she
warned Simpson was previously in the record.
            Generally, an objection must be made every time inadmissible evidence is offered. 
Ethington, 819 S.W.2d at 858. Where a party fails to make a timely objection each time particular
testimony is offered, no reversible error is presented. See Leday v. State, 983 S.W.2d 713, 718 (Tex.
Crim. App. 1998); Ethington, 819 S.W.2d at 858. Therefore, the subsequent admission of the fact
that Jacquelyn warned Simpson about spending time with Martin does not constitute reversible error.
            The objected-to hearsay, however, contained a dramatic piece of information not
communicated in the earlier testimony, that spending time with Martin that night "was going to be
the worst mistake he ever made." We hold that phrase was erroneously admitted. We analyze its
harmfulness in section five of this opinion.
4. Admitting Nonresponsive Testimony that Martin had been "Locked Up" was not Error, but
Admitting Testimony that Martin "Started Acting Strangely" was Error

            Martin also contends the trial court erred by overruling his objection to volunteered,
nonresponsive testimony by Jacquelyn:
Q.Okay. And this gun - - you say Sherman would come over to your house every day?
 
A.Mostly every day, unless he was locked up. He had been coming to my house
ever since he was a child. He was like a son to me until he after [sic] started acting
strangely, and I had - -
 
[Counsel]:I move to strike as nonresponsive, your Honor.
 
The Court:Overruled.

(Emphasis added.)
            The challenged testimony was not responsive to the question, which was whether Martin
came over to Jacquelyn's house every day. The two, arguably damaging, nonresponsive elements
to her answer were that Martin was at least occasionally "locked up" and that he had started acting
strangely.
            The stronger information, that Martin was at least occasionally "locked up," had previously
entered the record without objection. On direct examination of Jacquelyn by the State, this exchange
had occurred:
Q.Okay. And how often would you see Sherman?
 
A.Almost every day, unless he was locked up or something, because him [sic]
and my nephew is [sic] like brothers."

(Emphasis added.)

            Generally, an objection must be made every time inadmissible evidence is offered. 
Ethington, 819 S.W.2d at 858. Where a party fails to make a timely objection each time particular
testimony is offered, no reversible error is presented. See Leday, 983 S.W.2d at 718; Ethington, 819
S.W.2d at 858. We hold that overruling counsel's objection to Jacquelyn's volunteered phrase
"unless he was locked up" presents no reversible error, since it was already in the record without
objection.
            Yet the objected-to testimony included the volunteered phrase "until he after [sic] started
acting strangely." That comment was not responsive to the question asked, and the trial court erred
by overruling the objection to that extent.
 
 
 
 
5. Preserved Errors were not Harmful
            The next step is to apply a harm analysis to the preserved errors. Ordinarily, the admission
of inadmissible evidence constitutes nonconstitutional error.


 In our review of nonconstitutional
error, such as that found here, we are to disregard errors, defects, irregularities, or variances that do
not affect substantial rights of the accused. Tex. R. App. P. 44.2(b). A "substantial right" is affected
when the error had a substantial and injurious effect or influence in determining the jury's verdict. 
King v. State, 953 S.W.2d 266 (Tex. Crim. App. 1997).
            If, after examining the whole record, we find that error "may have had 'substantial influence'
on the outcome of the proceeding,"


 we should reverse. Burnett v. State, 88 S.W.3d 633, 637 (Tex.
Crim. App. 2002). If there are multiple errors, we should consider their cumulative effect in our
analysis. Stahl v. State, 749 S.W.2d 826 (Tex. Crim. App. 1988); see Harris v. State, 56 S.W.3d 52,
59 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd).
            If we have "a grave doubt" that the result was free from the substantial influence of preserved
error, then we must reverse. Burnett v. State, 88 S.W.3d 633, 637 (Tex. Crim. App. 2002). "Grave
doubt" means that, "in the judge's mind, the matter is so evenly balanced that he feels himself in
virtual equipoise as to the harmlessness of the error." Id. Thus, "in cases of grave doubt as to
harmlessness the petitioner must win." Id. We have no such doubt. The errors were harmless.
            Our more significant concern relates to the hearsay statement that Simpson's spending time
with Martin that night "was going to be the worst mistake he ever made." This dramatic,
erroneously-admitted, hearsay testimony was mentioned—once—in the State's jury argument, thus
giving it some prominence. The phrase suggests Jacquelyn's belief regarding Martin's dangerousness
to Simpson shortly before the shooting—an idea which was already in the record without
objection—and tends to promote the State's position that Martin was not acting in self-defense and
was thus guilty of murder. The other erroneously admitted testimony, about Martin "acting
strangely," is so vague as to strongly suggest it had no effect on the verdict, especially in light of our
harm analysis, below.
            On review of the record, we conclude the "worst mistake" phrase is a small piece of debris
floating in a sea of evidence tending to show Martin's consciousness of guilt, partial admissions, and
numerous inconsistencies. Though there is certainly evidence on both sides, the important
conflicting evidence comes from Martin on one side and a host of witnesses on the other.
            There is evidence both that Martin was carrying a pistol and that he was not, and a jury could
conclude that Martin was carrying a gun. Martin admitted that he went with Simpson and shot him,
but there is evidence that Martin was bruised, and no evidence to the contrary—supporting his
position that a struggle took place between them. But the fact a struggle took place proves nothing. 
The injuries could have resulted from either Simpson's attempts to defend himself or from an
unprovoked attack. The evidence also shows that Simpson had used cocaine shortly before they
drove away together.
            Martin testified at trial that he had borrowed Simpson's truck and that, once Martin was in
the truck, Simpson directed him into a location near Simpson's home, where Simpson was going to
wait for Martin to return. Martin testified that, when he stopped the truck, Simpson began hitting
him in the head in an apparent robbery attempt.


 He said that, after landing several blows, Simpson
appeared to be trying to reach something below him, that he managed to yank up Simpson's arm and
bite it, and that, when he looked down, he saw Simpson trying to get a gun.


 Martin testified they
wrestled over the gun and it went off, shooting Simpson. Martin then got out of the pickup truck
with the gun and ran to a nearby house to seek help. The house owner called the police, and Martin
panicked, being concerned that he might already be wanted on other warrants, drove the truck away,
and left Simpson there and still alive, according to Martin's testimony. 
            The doctor who performed the autopsy testified the gun was fired from between a few inches
and a couple of feet from the victim. He also testified that a blood test showed the victim had a low
level of alcohol and cocaine in his blood, as well as metabolites created as cocaine broke down in
the body. On cross-examination, the doctor also testified that a mark on Simpson's forearm could
have been the result of a bite. 
            But by far the greater bulk of the evidence lines up against Martin.
            The truck in which Simpson's shooting occurred was burned shortly after the shooting. 
Though Martin denied knowing how it was burned, he admitted believing that one of his "home
boys" probably burned it so Martin would not go to jail. Jacqueline, however, testified that Martin
told her after the shooting he was going to burn the truck. Gerald testified that Martin admitted later
that evening to having burned the truck, so he would not get into trouble. There was expert
testimony that, based on examination of the burned truck, it had been intentionally burned with
gasoline. Martin testified he had told only Jacquelyn where he had parked the truck after the
shooting. If the truck had been burned by any friend of Martin other than Jacquelyn, she or Martin
must have told someone else the location of the truck. There was no evidence anyone, other than
those two, knew the location of the truck. Though Martin admitted abandoning the truck, he does
not account—other than with speculation—for how it was burned.



            Martin denied owning or having a gun, but there was contrary evidence from two of Martin's
acquaintances. This evidence was that Martin owned a large black semi-automatic handgun he had
given the name "Black Beautiful." There is testimony that Martin was carrying a handgun in his
pants the night of the shooting. Martin admitted returning to the scene of the shooting while
Simpson was still alive, putting the gun to Simpson's head, and demanding that the wounded
Simpson drive him back to Longview. When Simpson said he could not drive, Martin admits he
drove himself back to Longview. No firearm was recovered, but a firearm expert opined that the
shell casing recovered from the truck was consistent with the use of a semi-automatic pistol in the
shooting. Though Martin admitted having possession that evening of the gun that killed Simpson,
he does not account for what happened to it. 
            Martin denied that, during the confrontation between Simpson and Martin, they exchanged
any words at all. But there was contrary evidence from two bystanders in the immediate area of the
shooting. Maurice Earl was awakened that night by a loud noise and heard a spoken threat, "I'll kill
you." A few seconds later, Earl saw a tall, slim, shirtless black man quickly walking. That
description was consistent with Martin's appearance. Though Earl says he did not clearly hear a
gunshot, the loud noise that awakened him may have been the shot. Eddie Jackson, another resident
in the area of the shooting, testified he got up from his couch when he heard loud arguing from two
people outside. After he laid back down on the couch, he heard a gunshot. He got up again and saw
a young, dark-skinned, shirtless man with braided hair—again a description consistent with Martin's
appearance—come trotting up to the Jackson house with a large, dark, semi-automatic pistol. 
Neither bystander could identify any party to the conversation, but there is no evidence of any other
confrontation in that location that night.
            When the State cross-examined Martin comparing his custodial statement with his trial
testimony, many contradictions and inconsistencies were developed. While Martin's statement
recounted, "I shot him," his live testimony insisted "the gun went off" accidentally during a struggle.


 
His statement indicated Simpson got tangled in the steering wheel, though at trial Martin denied that
happened. Martin's statement indicated his belief that Simpson had been shot "in the left"
side—consistent with the physical evidence—while his live testimony maintained Martin thought
Simpson had been shot in the leg. In his trial testimony, Martin maintained that, during the struggle,
Simpson had patted Martin's pocket, indicating to Martin that Simpson intended to take his money,
though Martin's statement omitted any reference to that detail. Time after time, as Martin was
confronted with inconsistencies, he was relegated to a weak surmise that the officer who prepared
the statement had made yet another mistake, despite Martin's signature on the completed statement.
            The evidence showed Martin fled the scene of the shooting and did not want authorities
called after the shooting.


 It showed he did not report the incident—which he portrayed
inconsistently as an accidental or self-defense shooting on the heels of Simpson's attempted robbery
of Martin—to police and delayed turning himself in until two days after the shooting. Martin also
reportedly told officers initially that he knew nothing about the shooting, before changing his mind
and making his statement. 
            Outside of Martin's own testimony, which the jury apparently did not believe—and, we are
convinced, would not have believed even without the two pieces of erroneously admitted
evidence—the evidence leads to the firm conviction that, after shooting Simpson, Martin, in a course
of action consistent only with a consciousness of guilt, fled the scene of the shooting, burned the
truck where the shooting occurred, disposed of the murder weapon, changed into clean clothes, and
tried to avoid police for a couple of days.
            In light of the record as a whole, we are reasonably assured that the errors, considered
together, did not substantially influence the jury's verdict. Therefore, they were not harmful. See
Tex. R. App. P. 44.2.
            We affirm the judgment.
 
                                                                                    Josh R. Morriss, III
                                                                                    Chief Justice

Date Submitted:          July 21, 2004
Date Decided:             October 26, 2004

Publish